Patrick W. SIMMONS, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

No. 90–1365.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 29, 1991.

Decided May 31, 1991.

Rehearing and Rehearing En Banc Denied Aug. 9, 1991.

Gordon P. MacDougall, Washington, D.C., for petitioner.

Judith A. Albert, New York City, Atty., I.C.C., with whom James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Marion Jetton, Attys., Dept. of Justice, Robert S. Burk, Gen. Counsel, and Henri F. Rush, Washington, D.C., Associate Gen. Counsel, I.C.C., were on the brief, for respondents.

Before WALD, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting Opinion filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

In the administrative proceeding under review, the Interstate Commerce Commission ("ICC" or "Commission") granted a petition by CMC Real Estate Corporation ("CMC") and Soo Line Railroad Company ("Soo") to exempt from regulation their abandonment and discontinuation of service on a 2.27-mile rail line in Rockford, Illinois. Patrick Simmons, legislative director of the United Transportation Union ("UTU"), challenges the Commission's decision, arguing that the abandonment and discontinuation is actually a transfer of the line and service, and should be subject to the employee protection measures required for line transfers. Because we find that the ICC's findings are supported by sub-stantial evidence in the record, we deny Simmons's petition for review.

## I. BACKGROUND

CMC is the successor in interest to the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Railroad"). Since the Railroad's bankruptcy, most of its lines and properties have been transferred or abandoned. At issue in this case is a 2.27-mile track located in Rockford, Illinois. CMC is the present owner of that line, which is being operated by Soo for the benefit of a single shipper, Aetna Plywood, Inc. ("Aetna"). CMC and Soo filed a petition with the ICC seeking to abandon the line and requesting the ICC to exempt this abandonment from regulation.

Line abandonments are generally governed by 49 U.S.C. § 10903, under which the ICC will allow abandonment "only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." The ICC may exempt an abandonment from this provision where continued regulation "(1) is not necessary to carry out the transportation policy of section 10101a of this title; and (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505. CMC and Soo filed a joint petition requesting the ICC to exempt the abandonment under 49 U.S.C. § 10505, arguing that the abandonment met the above-listed conditions.

The sole shipper on the line, Aetna, gave its full support to the petition. Before filing the petition, CMC had agreed to transfer the line to Aetna following abandonment, and Aetna had arranged to have a carrier, Chicago, Central & Pacific ("CCP"), provide service on the line. Thus, Aetna would be assured of continued and adequate rail service. Verified Joint Petition for Exemption, Docket Nos. AB-7 (Sub-No. 115X) and AB-57 (Sub-No. 30X), (Aug. 25, 1989).

The petitioner in this case, Simmons, protested the exemption on behalf of UTU,

arguing that the proposed abandonment was actually a line transfer between carriers. If the transaction were a line transfer between carriers, both the transferring carriers and the acquiring carriers would be required to provide protection measures to their employees under *New York Dock Ry.—Control—Brooklyn Eastern Dist.*, 360 I.C.C. 60 (1979). Because CMC and Soo structured their transaction as an abandonment, they provided in their implementing agreement that they would provide the employee protection measures required under *Oregon Short Line R. Co.— Abandonment—Goshen*, 360 I.C.C. 91 (1979), requirements similar to those in *New York Dock*, but applicable only to the transferring carriers. Because UTU represents employees of both Soo, the carrier currently operating the line, and CCP, the carrier that will operate the line following Aetna's purchase, UTU argued that this "sham" restructuring of the transaction as an abandonment deprived CCP employees of the protection they would have received were the transaction characterized as a line transfer.

Despite UTU's objections, the ICC granted CMC's and Soo's petition for exemption, finding that the transaction met the conditions set forth in § 10505. The petition requested only an exemption for CMC's abandonment, but the ICC recognized that Soo also needed permission to discontinue service over the line and, of its own motion, also granted Soo an exemption for its discontinuation. *CMC Real Estate Corp.— Abandonment Exemption—In Rockford, IL*, Docket No. AB–57 (Sub–No. 30X) at 1 n. 1 (Feb. 12, 1990) ("*CMC*"). First, the ICC determined that the exemption would further railroad transportation policy by decreasing the administrative expense associated with the line, thereby fostering sound economic conditions and encouraging efficient management. *Id.* at 4. Second, the ICC found that the transaction was of limited scope because it involved "only 2.27 miles of rail line serving only one shipper." *Id.* Finally, the ICC found that, "since that shipper fully supports the relief, regulation is not necessary to protect shippers from an abuse of market power." *Id.*

The ICC rejected UTU's contention that the transaction was actually a line transfer rather than an abandonment. The ICC relied on a previous ICC decision, *CSX Transportation, Inc.—Abandonment Exemption—In Grant and Miami Counties*, No. AB–55 (Sub–No. 264X) (Nov. 30, 1989) (not printed), for the proposition that the ICC need look only to the transaction before it, "and what subsequently occurs to the abandoned right-of-way is not an issue here." *CMC* at 3. According to the ICC, there was no support for UTU's allegation that the abandonment was a sham, structured merely to avoid the employee protection requirements associated with a line transfer. The ICC went on to note that, under the implementing agreement between CMC and Soo, Soo employees would be entitled to the employee protection measures required by *Oregon Short Line*, which, it asserted, were substantively identical to those provided under *New York Dock*. *Id.* Accordingly, the ICC found no obstruction to approving the exemption for the abandonment and discontinuance.

Following the ICC's decision, UTU filed a petition for reconsideration. UTU argued that the ICC misapplied its earlier decision in *CSX Transportation*. UTU argued first that the subsequent sale in this case was more "imminent" than the one following abandonment in *CSX Transportation*. Petition for Reconsideration, Docket Nos. AB–7 (Sub–No. 115X) and AB–57 (Sub–No. 30X) at 3–4 (Mar. 9, 1990). The ICC rejected this contention, stating that *CSX Transportation* was based not on the imminence of the sale, but on "the longstanding principle that carriers may proceed in stages, subject to our review of regulated transactions, and subsequent transactions will take into account any cumulative effects from prior transactions." *CMC Real Estate Corp.—Abandonment Exemption— In Rockford, IL*, Docket No. AB–7 (Sub– No. 115X) at 2 (July 6, 1990) (footnote omitted).

UTU also argued that the ICC could not properly rely on *CSX Transportation*, as the case is currently pending on appeal before this Court. However, the ICC

found that *CSX Transportation* remained good law pending the appeal, and that the ICC was free to act on its own authority provided its actions did not collide directly with the court's jurisdiction. *Id.* (citing *American Farm Lines v. Black Ball*, 397 U.S. 532, 541, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (1970)). Accordingly, the ICC denied UTU's petition. Simmons now appeals to this Court on behalf of UTU.

## II. DISCUSSION

■ Simmons argues that the parties to the transaction are trying to circumvent employee protection requirements by structuring this transaction as an abandonment subject to *Oregon Short Line* employee protection requirements, rather than as a line transfer subject to the requirements of *New York Dock*. Simmons argues first that the employee protection requirements of *New York Dock* are more stringent than those of *Oregon Short Line* because *New York Dock* requires the parties to the transaction to negotiate and enter into an "umbrella" agreement covering the employees of both the selling and acquiring carriers. Although we do not decide the issue at this time, we note that the requirement of an "umbrella" agreement has been rejected both by the ICC, *see Wilmington Term R., Inc.—Pur. & Lease—CSX Transp., Inc.*, 6 I.C.C.2d 799, 815 (1990), and by the Sixth Circuit, *Railway Labor Executives' Ass'n v. ICC*, 930 F.2d 511 (6th Cir.1991) (affirming *Wilmington*). *See also Railway Labor Executives' Ass'n v. Staten Island R. Corp.*, 792 F.2d 7, 9 n. 4 (2d Cir.1986) (*Oregon Short Line* employee protection requirements substantively identical to those of *New York Dock*); *Simmons v. ICC*, 760 F.2d 126, 129 (7th Cir. 1985) (same), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). For these reasons, the ICC argues that UTU, and therefore Simmons, lacks standing to challenge the ruling on the theory that there is no justiciable injury. While that argument is not without appeal, we disagree.

Even assuming the substantive requirements to be identical, the scope of the employee protection requirements applicable to a line transfer between carriers under *New York Dock* is more inclusive than of those requirements applying to an abandonment under *Oregon Short Line*. A line transfer between carriers is governed by 49 U.S.C. § 11343, which requires *both* the transferring and the acquiring carrier to provide protection to their employees.

[I]n line sale (and leases) cases under § 11343 the seller must: (1) provide full *New York Dock* protection to its affected employees; (2) arrive at an implementing agreement or agreements with them prior to consummation; and (3) impose no penalty for their decision not to take similar jobs under the rates of pay and work rules offered by the buyer.

The buyer must provide full *New York Dock* protection to its own employees and arrive at an implementing agreement or agreements with them prior to consummation. Unless otherwise provided by contract, the buyer's only obligation to the seller's employees will be to inform them of any availability of, and the terms and conditions of, employment.

*Wilmington*, 6 I.C.C.2d at 814–15. An abandonment is governed by 49 U.S.C. § 10903, rather than § 11343. In contrast to a line transfer, only the abandoning carriers are party to an abandonment, and therefore only those carriers need provide employee protection under *Oregon Short Line*. *Simmons*, 760 F.2d at 129. As UTU represents employees of both Soo and CCP, Simmons therefore argues that the alleged restructuring of the transaction as an abandonment and subsequent sale deprives its members of protection they would otherwise receive.

Simmons's argument assumes that the ICC would otherwise view the transaction as a line transfer between carriers governed by 49 U.S.C. § 11343. However, in this case, the purchaser, Aetna, may well be a non-carrier, since Aetna functions as a shipper, rather than as a line operator. A line sale from a carrier to a non-carrier would be governed by § 10901, the same section that governs if the transaction is a sale following an abandonment. *Railway Labor Executives' Ass'n v. United States*,

791 F.2d 994, 1004 (2d Cir.1986); *Railway Labor Executives' Ass'n v. ICC*, 819 F.2d 1172, 1173 (D.C.Cir.1987). Under § 10901, the ICC has discretionary authority to impose employee protection requirements, *see Black v. ICC*, 762 F.2d 106, 116–17 (D.C. Cir.1985); *In re Chicago, Milwaukee, St. Paul & Pac. R.*, 658 F.2d 1149, 1169–70 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), and has indicated that it will impose such requirements only in extraordinary circumstances, *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901*, 1 I.C.C.2d 810 (1985), *aff'd sub nom Illinois Commerce Commission v. ICC*, 817 F.2d 145 (D.C.Cir.1987). Thus, were we to find this transaction to be a line transfer rather than an abandonment, it is unclear what level of employee protections would be implemented. However, that would be a decision for the ICC, rather than for this Court in the first instance. Nonetheless, for our purposes, the possibility that this transaction could be a line transfer between carriers yields sufficient potential for greater protection to CCP employees to provide a justiciable injury in the present case.

■ In this proceeding, we need determine only whether the ICC's decision granting the exemption was arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence on the record as a whole. 5 U.S.C. § 706(2). "The reviewing court is not to substitute its conclusions for those of the Commission. Our duty is simply to determine whether there is substantial support in the record, viewed as a whole, for the ICC's findings." *Humphrey v. United States*, 745 F.2d 1166, 1170 (8th Cir.1984) (citations omitted); *accord Winter v. ICC*, 828 F.2d 1320, 1322–23 (8th Cir.1987). After reviewing the ICC's decision, we reject Simmons's challenge to the decision, and hold that the ICC has shown that its conclusions are in fact supported by substantial evidence.

■ Simmons argues that the ICC's decision should be set aside because the ICC relied on information outside of the record —namely, information related to the subse-

quent transfer of the line to Aetna—in deciding that the abandonment and discontinuance should be exempt from ICC regulation. Simmons argues that, by relying on the fact of the subsequent transfer in making its findings for exemption, the ICC's decision actually indicates that the abandonment is a sham, and that the transaction is more appropriately structured as a line transfer. The mere fact that a subsequent transfer has been arranged does not by itself bar the ICC from finding the transaction to be an abandonment. *See Winter*, 828 F.2d at 1323 (ICC finding of abandonment not barred where carrier was negotiating for replacement carrier); *see also Okmulgee Northern*, 320 I.C.C. 637, 640–41 (1964) ("there is nothing in the act which requires that a line of railroad, the abandonment of which has been permitted, shall be taken out of service for any particular period of time").

Simmons claims that it would be inconsistent for the ICC to state that it was making its decision based solely on the transaction before it, when it in fact based that decision on its knowledge of the subsequent transaction. The Seventh Circuit dealt with similar circumstances in *Black v. ICC*, 737 F.2d 643 (7th Cir.1984). Where the parties had conditioned a subsequent sale on abandonment, the Seventh Circuit held that the ICC could not rely on the subsequent sale in approving the abandonment. The court argued that, if the parties wished to conduct a sale that would be governed by § 10901, in a transaction that could occur only after the abandonment, "then it does not seem proper to permit the ICC to rely on the results of this sale, which has not yet taken place, in determining whether to permit the abandonment in the first instance." *Black*, 737 F.2d at 652.

We need not decide today whether the ICC can place reliance on a subsequent sale in a finding of abandonment, because we find that the ICC did not rely on the subsequent sale in exempting the abandonment and discontinuance. Simmons bases his arguments of reliance on two statements in the ICC opinion. First, in determining that rail transportation policy would not be ad-

versely affected, the ICC noted that "competition is not affected and the shipper has made satisfactory alternative arrangements." *CMC* at 4. Second, in examining the potential for abuse of market power, the ICC relied on the fact that the line served only one shipper and "that shipper fully supports the relief." *Id.* Because the shipper's position in this proceeding relied on the subsequent sale, Simmons argues that the ICC, by relying on the shipper's position, based its decision on the subsequent sale.

Thus, by Simmons's account, the ICC could never simply rely on the fact of a shipper's support in making an abandonment decision. Rather, Simmons would force the ICC to examine the motives behind the actions of every party related to the proceeding to determine if that party were relying on facts that the ICC itself could not take into account. Given the impracticability of such a task, we cannot find that the ICC acted unreasonably by failing to engage in such analysis in the present instance.

■ Nor do we find that the ICC's decision contradicts its statement that it based its exemption decision only on the transaction before it. Although the shipper is relying on a future transaction in its decision to pledge its support, that support is a present circumstance in the transaction at issue. That is not to say that the ICC can never look behind a shipper's position to determine if it is unrealistic. *Cf., e.g., Black, supra* (rejecting abandonment approval where ICC's decision relied on a future sale that the court deemed speculative). However, absent independent reasons for doubting a shipper's position, we believe that the ICC is entitled to rely on that position in making an exemption decision without further examination of the shipper's motives. Accordingly, we find that the ICC did in fact base its decision on the transaction before it, and that the shipper's position was relevant to that transaction. We therefore conclude that the ICC's decision was not arbitrary or capricious, but was based on substantial evidence in the record as a whole.

### III. CONCLUSION

For the foregoing reasons, we conclude that the ICC's decision to exempt CMC's abandonment of the line at issue in this case, as well as Soo's discontinuation of service on that line, was based on substantial evidence found in the record as a whole. Under the Administrative Procedure Act, 5 U.S.C. § 706(2), we therefore hold that Simmons's petition for review is

*Denied.*

WALD, Circuit Judge, dissenting in part:

In this case, the Commission granted CMC Real Estate Corporation's ("CMC") petition to exempt from regulation the abandonment of service over a 2.27–mile rail line in Rockford, Illinois. *CMC Real Estate Corporation—Abandonment and Exemption—In Rockford, IL,* No. AB–7 (Sub–No. 115X) (Feb. 2, 1990) (not reported) [hereinafter *ICC Decision* ], *recon. denied, CMC Real Estate Corporation—Abandonment Exemption in Rockford, IL,* No. AB–7 (Sub–No. 115X) (July 6, 1990) (not reported) [hereinafter *Reconsideration Decision* ]. Petitioner Patrick Simmons, Illinois Legislative Director for the United Transportation Union ("UTU"), challenges the exemption on the ground that the transaction involved is not really an abandonment at all but a line sale that the parties have restructured as an abandonment and a subsequent sale of an abandoned line. Whether the transaction is really an abandonment or a line sale makes a difference because, as the majority recognizes, the Interstate Commerce Act ("Act") requires the Commission to impose somewhat less stringent labor protective conditions on abandonments and subsequent sales of abandoned lines than on line sales. The majority concludes that the Commission did not act unreasonably in granting CMC's abandonment petition because Aetna Plywood, Inc. ("Aetna"), the only shipper served by the line, supported the abandonment petition. My concern is that the majority's affirmance of the Commission's action will allow carriers hereinafter to

structure the transfer of an active rail line as an abandonment and subsequent sale of an abandoned line rather than a line sale in order to avoid providing their employees with the labor protection mandated by the Act. Since I believe such a result is in violation of Congress' directive as to how the Commission must treat a sale of a line between two carriers, I respectfully dissent.[1]

The Commission's opinion rests on the formal assertion that only the abandonment of a rail line by CMC and discontinuance of operation on it by Soo Line Railroad Company ("Soo") are currently before it; "what subsequently occurs to the abandoned right-of-way is not." *ICC Decision* at 3. Yet its own subsequent analysis belies that narrow focus because in deciding whether the "abandonment" is in the public interest, the Commission does consider what will subsequently happen to the abandoned right-of-way, *i.e.*, it will be sold to and operated for the benefit of the sole shipper served by the line. We are asked to join in the blinking exercise as well—"a sale by any other name" is not a sale after all.

The Commission's opinion itself, as well as the record, indicate that Aetna, the shipper served by the line, supported the abandonment petition because Aetna had previously entered a contract to purchase the line contingent upon CMC receiving abandonment authority from the Commission. *See, e.g., ICC Decision* at 1–2; Verified Statement of N. Keith Weller, Branch Manager for Aetna.[2] Although the Commission was more obscure, it found that the abandonment was in the public interest because "the shipper has made satisfactory alternative arrangements." *ICC Decision* at 4. Notwithstanding the Commission's indirect language, those "satisfactory alternative arrangements" were obviously the agreements Aetna had already made to purchase the line and obtain switching service from CCP. Thus, the Commission

found that the abandonment was in the public interest because the abandonment was the first step of a two-step transaction that would leave the rail transportation policy unaffected: after the abandonment, CMC would sell the line so rail service would continue to be provided to the only shipper using the line.

Perhaps that way of doing the deal would normally produce only a ho-hum if it were not for two other considerations: statutory compliance and labor protection. As UTU points out, by allowing CMC to abandon and Soo to discontinue service over the line when there was undisputed evidence that Aetna would subsequently purchase and CCP would provide service over the abandoned line, the Commission may have allowed the parties to do an end-run around the line sale provisions of the Act. As the majority recognizes, the sale of an active line from one carrier to another is governed by 49 U.S.C. § 11343, and 49 U.S.C. § 11347 mandates that the Commission require both the selling and purchasing carriers to provide *New York Dock* protection to their employees who may be adversely affected by the line sale. *See Wilmington Terminal Railroad, Inc. —Purchase and Lease—CSX Transportation, Inc.,* 6 I.C.C.2d 799, 815 (1990), *aff'd sub nom. Railway Labor Executives' Association,* 930 F.2d 511 (6th Cir.1991). On the other hand, the sale of an abandoned line is governed by 49 U.S.C. § 10901, and in approving such sales, the Commission has the discretion to impose or not to impose labor protective conditions on the parties involved. *See Black v. ICC,* 762 F.2d 106, 116 (D.C.Cir.1985). Indeed, the Commission has decided that it generally will not exercise its discretion to impose labor protection in § 10901 transactions. *See Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901,* 1 I.C.C.2d 810, 813–14 (1985), *aff'd sub nom. Illinois Commerce Commission*

---

1. I agree that UTU has standing, and I join the majority's standing analysis.

2. The State of Illinois had also agreed to support Aetna by paying for rehabilitation of the line and construction of a switch. And Aetna had reached an agreement with Chicago, Central & Pacific Railroad Company ("CCP") to provide switching service to Aetna. *ICC Decision* at 2; Weller Verified Statement at 2.

*v. ICC,* 817 F.2d 145 (D.C.Cir.1987). Consequently, if what would ordinarily be conducted as a line sale is instead structured as an abandonment and subsequent sale of an abandoned line, the abandoning carrier will have to provide *Oregon Short Line* protection only to its own employees at the time of the abandonment; later when the abandoning carrier sells the line, neither the purchasing carrier nor the selling carrier will have to protect their employees as they would if the purchase were an inter-carrier line sale and *New York Dock* applied.

Although the Commission has broad discretion to approve abandonments and sales that it finds to be in the public interest,[3] it does not follow that the Commission has the authority to approve as an abandonment what everyone knows is a sale by the abandoning carrier to another carrier who will continue to provide service. Such cases actually involve the transfer of active rail lines from one carrier to another, which the Commission is required to evaluate under 49 U.S.C. § 11343,[4] and as to which it is required to impose labor protection under 49 U.S.C. § 11347.[5] To hold otherwise is to allow carriers to effect a sale of an active line without protecting the employees adversely affected by the sale as mandated by Congress.

In its brief before this court, the Commission argues that even if it were to look beyond the abandonment petition to the subsequent sale, the transaction would not be a line sale subject to 49 U.S.C. § 11343, and the *New York Dock* labor protection mandated by 49 U.S.C. § 11347, because the purchaser, Aetna, is not a carrier. Thus, the Commission's brief concludes that the Commission acted reasonably in rejecting UTU's claim that the transaction at issue in this case was really a line transfer. The problem with this argument is that the Commission's opinion did not rest on this justification, so we cannot rely on it here; it is post-hoc rationalization pure and simple.

In fact, the Commission's opinion never addressed the merits of UTU's contention that the multi-party transaction between CMC, Soo, Aetna and CCP is a line sale subject to 49 U.S.C. § 11343. Instead, the Commission stated that it would look only at the abandonment petition currently pending, and would save any evaluation of the status of a subsequent sale until the

---

**3.** Section 10903 provides in relevant part:

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance....

(b)(1) ... if the Commission—

(A) finds public convenience and necessity, it shall—

(i) approve the application as filed; or

(ii) approve the application with modifications and require compliance with conditions that the Commission finds are required by public convenience and necessity; or

(B) fails to find public convenience and necessity, it shall deny the application.

(2) On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees....

49 U.S.C. § 10903.

**4.** Section 11343 provides in relevant part:

(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may be carried out only with the approval and authorization of the Commission:

....

(2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.

....

49 U.S.C. § 11343.

**5.** Section 11347 provides in relevant part:

When a rail carrier is involved in a transaction for which approval is sought under sections [relating to § 11343 transactions], the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. § 565)....

49 U.S.C. § 11347.

next go-round if and when the parties petitioned for review of that transaction. *ICC Decision* at 3; *Reconsideration Decision* at 2. But in reality the petition for review of the subsequent sale will not provide the Commission with an opportunity to address UTU's claim that the sale is an inter-carrier line transfer subject to 49 U.S.C. § 11343 because the Commission will have already approved CMC's petition to abandon the line. Consequently, CMC will be seeking approval to sell an *abandoned* line, which, as discussed above, is governed by 49 U.S.C. § 10901, not 49 U.S.C. § 11343. Thus the prospect of any meaningful Commission review at the subsequent sale stage as to the nature or status of the entire transaction is problematical, at best.

I would, therefore, grant the petition for review and remand for the Commission to determine whether the transaction to which the parties have agreed is actually a line sale that has been structured as an abandonment and subsequent sale. If the Commission finds that it is, it should deny the abandonment petition and inform the parties that they must file a petition for permission to transfer the line under 49 U.S.C. § 11343.