**James E. REDDEN, Petitioner,**

**v.**

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**CSX Transportation, Inc., Kokomo Grain Company, Inc., Intervenors.**

No. 90–1034.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1990.

Decided Feb. 19, 1992.

As Amended Feb. 19, 1992.

Robert B. Nicholson, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Lawrence H. Richmond, with whom Peter J. Shudtz, Baltimore, Md., and Charles M. Rosenberger, Jacksonville, Fla., were on the brief, for intervenor CSX Transp., Inc.

Carl M. Millen entered an appearance, for intervenor Kokomo Grain Co., Inc.

Before WALD and WILLIAMS, Circuit Judges, and THOMAS, Circuit Justice.*

Opinion for the Court filed by Circuit Justice THOMAS.

THOMAS, Circuit Justice:

In this case, we consider whether the Interstate Commerce Commission may exempt from regulation an abandonment of track conditioned upon the track's sale and continued operation, on the sole ground that the continued operation ensures satisfaction of the national transportation policy. We hold that it may not.

### I

If a rail carrier desires to stop providing service on a line that it owns and operates, it may either abandon the line, transfer the line to another carrier (whether by sale, lease or grant of trackage rights), or transfer the line to a non-carrier. The Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* (1988), regulates each of these possible transactions.

The Act regulates abandonments under 49 U.S.C. § 10903, which requires a carrier to obtain prior approval from the Commission in order to "abandon any part of its railroad lines" or to "discontinue the operation of all rail transportation over any part of its railroad lines." *Id.* § 10903(a). The Commission may grant approval only if it finds that "public convenience and necessity" permit the abandonment. *Id.* The Commission must also make certain provisions "to protect the interests of employees" affected by the abandonment. *Id.*

Gordon P. MacDougall, Washington, D.C., for petitioner.

Louis Mackall, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, for I.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Craig M. Keats, Atty., I.C.C., Marion L. Jetton and

---

* Justice Thomas was a member of this court when the case was briefed and argued and to-

day has been designated Circuit Justice of this court. *See* 28 U.S.C. §§ 42, 43(b).

§ 10903(b)(2). In order to comply with this requirement, the Commission conditions its approval upon the terms set out in *Oregon Short Line Railroad Co.—Abandonment—Goshen*, 360 I.C.C. 91 (1979), which requires an abandoning carrier to guarantee to any employee laid off because of the abandonment, during the six years following the layoff, an income equal to his former salary with the carrier. *See id.* at 100.

The Act regulates all line transfers under either 49 U.S.C. § 10901 or 49 U.S.C. § 11343. In pertinent part, section 10901 requires a carrier to obtain prior approval in order to "acquire or operate an extended or additional railroad line." 49 U.S.C. § 10901(a)(3).[1] In pertinent part, section 11343 requires a carrier to obtain prior approval in order to "purchase, lease, or contract to operate property of another carrier." *Id.* § 11343(a)(2).[2] By regulation, the Commission has determined that section 10901 governs a line transfer if either the transferror or the transferree is a non-carrier. *See* 49 C.F.R. § 1150.1(a) (1991); *see also Application Procedures for a Certificate to Construct, Acquire or Operate Railroad Lines*, 365 I.C.C. 516,

517–18 (1982) (explaining the regulation). Moreover, the Commission has held repeatedly that section 10901 governs the transfer of a line approved for abandonment, even if both the transferror and the transferree are carriers. *See, e.g., Central Railroad Co.—Abandonment*, 342 I.C.C. 227, 263–64, 282–83 (1972); *Tennessee Central Railway Co. Abandonment*, 334 I.C.C. 235 (1969); *Okmulgee Northern Railway Co. Abandonment*, 320 I.C.C. 637, 637–39 (1964).[3] Thus, section 11343 governs only the carrier-to-carrier transfer of lines that are not approved for abandonment.

Sections 10901 and 11343 make different provisions for employee protection. For section 10901 transactions, the Commission is not required to protect employees, *see* 49 U.S.C. § 10901(e), and has announced that it generally will not do so. *See Class Exemption for the Acquisition & Operation of Rail Lines Under 49 U.S.C. § 10901*, 1 I.C.C.2d 810, 813–14 (1985). For section 11343 transactions, however, the Commission must ensure that the carriers involved provide employee protections. *See* 49 U.S.C. § 11347. The Commission does so

---

**1.** Section 10901(a) provides:

A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—

(1) construct an extension to any of its railroad lines;

(2) construct an additional railroad line;

(3) acquire or operate an extended or additional railroad line; or

(4) provide transportation over, or by means of, an extended or additional railroad line;

only if the Commission finds that the present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line.

**2.** Section 11343(a) provides:

The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may be carried out only with the approval and authorization of the Commission:

(1) consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.

(2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.

(3) acquisition of control of a carrier by any number of carriers.

(4) acquisition of control of at least 2 carriers by a person that is not a carrier.

(5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.

(6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned and operated by another rail carrier.

Despite the exact phrasing of § 11343(a)(2), in which the word "property" functions as the direct object only of the infinitive "to operate," it is well-settled that § 11343(a)(2) encompasses acquisitions of *assets* (a "purchase" of "property of another carrier") as well as acquisitions of *equity* (a "purchase ... of another carrier"). *See, e.g.,* 49 C.F.R. § 1150.1(a) (1991) ("[A]quisition by a carrier of an active rail line owned by a carrier is covered by 49 U.S.C. § 11343.").

**3.** These cases were decided under the statutory predecessors of §§ 10903, 10901 and 11343. For ease of exposition, we refer only to the current provisions.

by imposing some variant of the conditions initially set out in *New York Dock Railway—Control—Brooklyn Eastern District Terminal*, 360 I.C.C. 60, *aff'd*, 609 F.2d 83 (2d Cir.1979), and later clarified in *Wilmington Terminal Railroad—Purchase and Lease—CSX Transportation, Inc.*, 6 I.C.C.2d 799 (1990), *aff'd sub nom. Railway Labor Executives' Ass'n v. ICC*, 930 F.2d 511 (6th Cir.1991).[4] *New York Dock* requires both the transferror and the transferee to provide their respective employees with the same set of entitlements that an abandoning carrier must provide to its employees under *Oregon Short Line. See* 360 I.C.C. at 84–90.

Under 49 U.S.C. § 10505, the Commission has authority to exempt both abandonments and line transfers from the respective requirements of sections 10903, 10901 and 11343. Section 10505 provides that the Commission must exempt a transaction from regulation whenever it makes two findings: first, that application of the relevant provision "is not necessary to carry out the [national] transportation policy" described in 49 U.S.C. § 10101a, which enumerates fifteen general goals to be served by federal regulation of the railroads; and second, either that "the transaction ... is of limited scope" or that application of the relevant provision "is not needed to protect shippers from abuse of market power." *Id.* § 10505(a). The Commission cannot use its exemption power, however, to relieve a carrier of any statutory obligation "to protect the interests of employees." *Id.* § 10505(g)(2).

## II

CSX Transportation Company owns and operates a twenty-mile stretch of track running between Marion and Santa Fe, Indiana. The line currently serves five shippers, by far the largest of which is the Kokomo Grain Company. CSX petitioned the Commission for an abandonment exemption, stating that Kokomo Grain had agreed to purchase and to arrange for continued rail service on the twelve-mile segment between Marion and Amboy.

The Commission granted the exemption, subject to *Oregon Short Line* conditions. *CSX Transp.—Abandonment Exemption*, No. AB–55 (Sub. No. 264X) (served Mar. 21, 1989). In so doing, it found that regulation of the abandonment was unnecessary to carry out the national transportation policy "because Kokomo Grain will acquire a significant portion of the line assuring continued rail service for itself and the other shippers on the line who desire service." *Id.* at 1–2. A few months after its initial decision, the Commission reopened the exemption proceeding and imposed the express condition that CSX "consummate the sale of the Marion–Amboy segment for continued rail operation immediately upon abandoning this line." *CSX Transp.—Abandonment Exemption*, No. AB–55 (Sub. No. 264X), at 2 (served July 19, 1989).

James E. Redden is the Indiana Legislative Director of the United Transportation Union (UTU), which represents many employees of CSX. Redden filed petitions to reopen and to reconsider the abandonment exemption, claiming that the Commission erred when it factored the prospective transfer into its decision to approve the abandonment exemption. He argued that the approved transaction could not go forward absent two further transactions: first (because of the express conditions), the sale of the track from CSX to Kokomo Grain; and second (because Kokomo Grain had shown no interest in entering the railroad business itself), the further transfer of that track from Kokomo Grain to another carri-

---

**4.** The Commission imposes *New York Dock* conditions upon a carrier-to-carrier purchase and sale. For transfers among carriers involving leases or trackage rights, it imposes slightly different conditions. *See Mendocino Coast Ry.— Lease & Operate—California W. R.R.*, 354 I.C.C. 732 (1978), *modified*, 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Ass'n v. United States*, 675 F.2d 1248 (D.C.Cir.1982); *Norfolk & W. Ry.—Trackage Rights—Burlington N.*, 354 I.C.C. 605 (1978), *modified sub nom. Mendocino Coast Ry.—Lease & Operate—California W. R.R.*, 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Ass'n v. United States*, 675 F.2d 1248 (D.C.Cir.1982). The minor differences among these conditions are immaterial to our analysis below.

er—most likely, according to Redden, the non-unionized Central Railroad Company of Indianapolis (CRRI). He maintained that the approved transaction, in substance if not in form, involved a carrier-to-carrier transfer of active line from CSX to CRRI— a transaction properly governed by section 11343. The Commission rejected Redden's arguments and denied his petitions. *CSX Trans.—Abandonment Exemption*, No. AB–55 (Sub. No. 264X) (served Nov. 30, 1989).

Redden petitioned this court for review, and CSX and Kokomo Grain intervened on behalf of the Commission. Just before oral argument, however, we were advised that Kokomo Grain no longer desires to acquire the Marion-to-Amboy segment. CSX continues to search for another buyer. The conditions on its abandonment exemption as yet unfulfilled, CSX still owns and operates the entire line.

## III

■ Before we address the merits, we must determine whether Redden, suing as a representative of UTU, has standing to invoke the jurisdiction of an Article III court.[5] UTU has standing to sue on behalf of the CSX employees only if (1) the employees would have standing to sue individually; (2) the union seeks to protect interests related to its purposes as a union; and (3) the suit does not require the participation of individual employees. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The CSX employees, in turn, would have standing to sue individually only if they have suffered (or will suffer) an injury that is fairly traceable to the Commission and likely to be redressed (or prevented) by a decision in their favor. *See, e.g., Valley Forge Christian College v. Americans United for Sep-*

*aration of Church & State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The injury must be qualitatively " 'distinct' " (as opposed to " 'abstract' "); and in a suit to prevent future harm, the possibility of injury must be "imminent" (as opposed to " 'conjectural' "). *See Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (citations omitted).

■ The parties dispute whether the CSX employees have suffered a qualifying injury. Redden correctly points out that the abandonment exemption disables them from receiving full *New York Dock* protections even if CSX ultimately should transfer the line to another carrier. The Commission responds that the *Oregon Short Line* protections to which the abandonment exemption entitles them are no less favorable than the *New York Dock* protections from which it disables them. Correctly, the Commission notes that CSX would owe its employees no more as a selling carrier under *New York Dock* than it currently owes them as an abandoning carrier under *Oregon Short Line*. The Commission, however, overlooks the fact that under *New York Dock*, the CSX employees would enjoy an additional entitlement running against the *buyer*—namely, the right to receive information about "any availability of, and the terms and conditions of, employment" with the buyer. *See Wilmington*, 6 I.C.C.2d at 814–15. That might not seem like much, but we have no doubt that the information would be of some value to the CSX employees, and that an order disabling them from future entitlement to that information threatens an injury concrete enough to satisfy Article III. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 2563–64, 105 L.Ed.2d 377 (1989) (holding that

---

**5.** Redden clearly lacks standing to sue in his individual capacity. Nonetheless, Redden and Patrick Simmons, who litigate frequently on behalf of UTU in this court, insist on suing in their own names. Sometimes, we have ignored this problem. *See, e.g., Simmons v. ICC*, 934 F.2d 363 (D.C.Cir.1991). Other times, we have ourselves replaced the name of the individual with the name of the union in the case caption.

*See, e.g., United Transp. Union v. ICC*, 891 F.2d 908, 909 n. 1 (D.C.Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). We now join the Seventh Circuit in explicitly warning Redden and Simmons that "in the future [they] should file in the name of the appropriate party." *Simmons v. ICC*, 900 F.2d 1018, 1019 n. 1 (7th Cir.1990).

denial of access to desired information may constitute a concrete enough injury).

■ The injury to the CSX employees will ripen only if a *carrier* should acquire the line. If a non-carrier should acquire the line, then section 10901 will govern the acquisition in any event, and the disabling effect of the abandonment exemption will have turned out to be meaningless. Under *Simmons v. ICC*, 934 F.2d 363 (D.C.Cir. 1991), however, we conclude that this prospect does not render the employees' injury too speculative. *Simmons* also involved a situation in which the injury asserted to establish Article III standing would have occurred only if the track at issue were sold to a carrier. The identity of the prospective buyer was clear, and it was a non-carrier. Nonetheless, we held that the "possibility" of the buyer being deemed a carrier for section 11343 purposes, though seemingly unlikely under recent precedent,[6] was great enough. *See* 934 F.2d at 367. That same possibility exists here, as does the possibility that the buyer in fact will be a carrier. We therefore conclude that the possibility of injury is not too speculative.

As the Commission points out, Redden's pursuit of this litigation carries significant downside risk for the CSX employees, whose best interests he purports to represent. As things now stand, the employees are guaranteed the substantial benefits of *Oregon Short Line*, regardless of the identity of the acquiring company. If Redden should prevail and the acquiring company should be a carrier, the employees will then gain an additional entitlement to notice regarding employment opportunities with that company. But if Redden should prevail and the acquiring company should be a non-carrier, then his victory will have proven disastrous, for the CSX employees will almost surely end up with no protection. One might fairly question whether the em-

ployees, if informed of the possible costs and benefits of pursuing this litigation, would elect to put at risk six years of guaranteed unemployment compensation in order to gamble for the entitlement to receive notice about one particular employment prospect. Ultimately, however, our task is not to determine whether the litigation *makes any sense* from the perspective of the CSX employees. For standing purposes, we need only find their threatened injury more distinct than abstract and more imminent than conjectural. Because these standards have been met, we proceed to consider the merits.

## IV

■ In granting the abandonment exemption, the Commission factored into its analysis the prospective purchase and continued operation of the track to be abandoned, without considering whether CSX would have preferred a total abandonment to continued operation if given only that choice. The Commission thus answered affirmatively a question we had reserved in *Simmons* —"whether the ICC can place reliance on a subsequent sale in a finding of abandonment," 934 F.2d at 367 [7]—and it rejected our considered dictum in *Black v. ICC*, 762 F.2d 106 (D.C.Cir.1985), that a carrier cannot obtain approval for an abandonment unless it "actually 'intend[s]' to cease permanently all transportation service on the ... line regardless of the outcome of its simultaneous negotiations to sell the line." *Id.* at 113.

Whatever the exact difference between a section 10901(a)(3) acquisition and a section 11343(a)(2) purchase, there can be no doubt that Congress intended for the Commission to regulate the latter far more carefully than the former. In considering approval for transactions regulated under section 11343, the Commission must hold a public

---

6. *See, e.g., Railway Labor Executives' Ass'n v. ICC*, 914 F.2d 276, 281–84 (D.C.Cir.1990) (upholding ICC decision to treat as non-carrier a wholly-owned subsidiary of a carrier created for the express purpose of acquiring active line from another carrier), *cert. denied,* — U.S. ——, 111 S.Ct. 1581, 113 L.Ed.2d 646 (1991).

7. We did not reach the question because we found that the order under review "did not rely on the subsequent sale in exempting the abandonment." 934 F.2d at 367. Here, by contrast, the Commission explicitly conditioned its action on the sale.

hearing, unless it specifically finds that such a hearing "is not necessary in the public interest." *Id.* § 11344(a). It must ensure that a copy of the application is filed with the Secretary of Transportation. *See id.* § 11345(a). It must accept written comments about an application and must serve those comments upon the Secretary and the Attorney General, either of whom may intervene of right in the proceeding. *See id.* § 11345(d)(1). And, of course, it must provide labor protections. *See id.* § 11347. None of these requirements applies to proceedings for approval of transactions regulated under section 10901.

This statutory scheme, we believe, must foreclose the Commission from regulating *all* line transfers under section 10901. Otherwise, Congress's decisions to enact section 11343(a)(2), and to impose special requirements on line transfers falling within that provision, would be inexplicable. The Commission is free, of course, to resolve ambiguity about the respective coverages of the two sections in any reasonable manner. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). But having interpreted section 10901 to encompass carrier-to-carrier transfers of lines approved for abandonment, the Commission cannot then invoke its admittedly broad power to approve abandonments in order to transform every section 11343 purchase into a section 10901 acquisition. The Commission, no less than any court, must give independent effect to all provisions in an integrated statutory scheme whenever possible. It would surely be unreasonable to construe the power to approve abandonments as authorizing the obliteration of section 11343(a)(2), and the various mandatory protections applicable to all transactions falling within it. Because the Commission's reasoning threatens exactly that result, we cannot countenance it.

The Commission reasoned that an abandonment would not adversely affect the national transportation policy because a subsequent acquisition would ensure continued rail service. In other words, an abandonment exemption cannot impede the national transportation policy as long as it is conditioned upon there being no abandonment. Of course, the order under review involves an abandonment *exemption,* which is available only in a limited class of cases where the transaction is small or the shippers are protected. But if the Commission may rely upon continued operation to find an abandonment exemption consistent with "the [national] transportation policy" under section 10505, then it is difficult to see why it cannot also do so to find an abandonment consistent with "the present or future public convenience and necessity" under section 10903. In short, the Commission's reasoning presupposes the authority to preface *any* carrier-to-carrier transfer with an abandonment approval conditioned upon the transfer, thus rendering optional labor protection (among other provisions) that Congress clearly intended to be mandatory.

The Commission cited no precedent that supports its no-abandonment, no-harm-done theory. The Commission relied exclusively upon *Central Railroad,* an example (according to the Commission) of a "similarly structured transaction[ ]." *CSX Transp.,* Nov. 30 Op., at 4 n. 6. *Central Railroad* in turn relied upon *Tennessee Central* and *Okmulgee Northern.* These cases establish that section 10901 governs a carrier-to-carrier transfer of a line approved for abandonment, even if the abandonment and the transfer are approved simultaneously. In all of them, however, the Commission justified the abandonment solely on the basis of the abandoning carrier's desperate financial situation, without reliance upon the subsequent transfer. *See Central R.R.,* 342 I.C.C. at 288; *Tennessee Central Ry. Co.,* 334 I.C.C. at 238; *Okmulgee Northern,* 320 I.C.C. at 644.

The Commission applied section 10901 to the transfer precisely because the abandonment had been independently justified. It reasoned that if a carrier must abandon a line regardless of whether any buyer is found, thus threatening its removal from interstate commerce entirely, then a purchasing carrier is closely akin to one who "construct[s] an additional railroad line" in interstate commerce, a transaction falling within section 10901(a)(2). *See Central*

*R.R.*, 342 I.C.C. at 264. Moreover, because a transfer for continued operation is surely better for employees than an outright abandonment, it makes little sense, if given only that choice, to deter prospective buyers by imposing labor-protective conditions on them. *See Tennessee Central*, 334 I.C.C. at 246; *Okmulgee Northern*, 320 I.C.C. at 641. Thus, the *Okmulgee Northern* case line involves abandonment-plus-transfer transactions similarly structured, but differently justified, from the one at issue here.

We conclude that the Commission's justification for the abandonment exemption rests on an unreasonable reading of the Interstate Commerce Act. The Commission cannot exercise its power to approve abandonments, whatever its exact scope, so as to collapse all section 11343 line sales into section 10901 acquisitions. Because the Commission's articulated rationale seems to support that very result, we cannot accept it. We offer no opinion on whether this particular abandonment exemption can be justified on narrower grounds.

The petition for review is granted, the orders of the Commission are vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*