**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Petitioner**

v.

**UNITED STATES of America and Surface Transportation Board, Respondents**

United Transportation Union, et al., Intervenors.

Nos. 95–1358, 95–1565.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1996.

Decided Nov. 22, 1996.

As Amended Dec. 20, 1996.

Gordon P. MacDougall, Washington, DC, argued the cause for petitioner. With him on the briefs was Harold A. Ross, Cleveland, OH.

Evelyn G. Kitay, Attorney, Surface Transportation Board, Washington, DC, argued the cause for respondents. With her on the brief were Henri F. Rush, General Counsel, Anne K. Bingaman, Assistant Attorney General, John J. Powers, III and Robert J. Wiggers, Attorneys, U.S. Department of Justice, Washington, DC.

Clinton J. Miller, III and Daniel R. Elliott, III, were on the brief for intervenor United Transportation Union.

Joseph D. Anthofer, T. Scott Bannister; and Kevin M. Sheys, Washington, DC, were on the joint brief for intervenors Union Pacific Railroad Company, et al.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

TATEL, Circuit Judge:

In these consolidated cases, the Brotherhood of Locomotive Engineers and the United Transportation Union petition for review of three Interstate Commerce Commission decisions in which the Commission found it

lacked jurisdiction over several railroad transactions. Two of the decisions concerned trackage-rights agreements involving the Union Pacific Railroad's Omaha–Council Bluffs freight terminal. The other decision addressed a group of leases concerning the Richmond Belt Railway in California. The central issue in all three petitions is the same: the reasonableness of the ICC's definition of "switching track," a type of track falling outside the agency's jurisdiction. Because we find that the Unions have failed to demonstrate injury-in-fact from the Commission's *Richmond Belt* decision, they lack standing to challenge that decision. Although the Locomotive Engineers' Union does have standing to challenge the Union Pacific decisions, we deny the petitions for review because we find that the ICC's definition of "switching track" is reasonable and that its application of that definition to the facts of the cases before it was neither arbitrary nor capricious.

## I

The Interstate Commerce Commission Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, abolished the ICC, transferring many of its functions to the Surface Transportation Board. The Termination Act provides that suits against the ICC commenced before its January 1, 1996 effective date should proceed as though it had not been adopted. 49 U.S.C.A. § 701, note c (West 1996). Since these cases were filed before the Termination Act took effect, the governing law is the pre-Termination Act version of the Interstate Commerce Act. For this reason, statutory citations in this opinion follow the pre-Termination Act numbering of the Interstate Commerce Act.

The Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* (1994), requires Commission approval for certain sorts of railroad transactions, including the two common transactions at issue in these cases. In a trackage-rights agreement, one railroad allows another railroad to operate over a portion of its track. The railroad that owns the track—the landlord carrier—continues to use the track, but the railroad acquiring the rights—the tenant carrier—gains access to additional track

without the expense of construction or outright purchase. Leases may also serve as a vehicle for avoiding the expense of construction or purchase, but they typically give the lessee exclusive use of the leased track.

The two Omaha–Council Bluffs cases concern trackage-rights agreements governed by section 11343 of the Act. That section requires rail carriers to seek Commission authorization for various transactions, including "acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier." *Id.* § 11343(a)(6). Railroads entering into transactions covered by this section must provide protection for workers harmed by the transactions. *Id.* § 11347; *see also Railway Labor Executives' Ass'n v. United States,* 339 U.S. 142, 146–54, 70 S.Ct. 530, 532–36, 94 L.Ed. 721 (1950) (recounting legislative history of predecessor of § 11347); *New York Dock Ry. v. United States,* 609 F.2d 83, 86–89 (2d Cir.1979) (describing origin and significance of amendments to § 11347).

The Richmond Belt transaction involves a group of leases covered by section 10901, which provides, in relevant part, that a rail carrier may "acquire or operate an extended or additional railroad line ... only if the Commission finds that the present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line." 49 U.S.C. § 10901(a) (1994). Unlike section 11343 transactions, section 10901 transactions are not subject to mandatory labor-protective arrangements. The Commission has discretionary authority to impose such arrangements, but it very rarely does so. *See Ex Parte No. 392 (Sub–No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810, 813–15 (1985), *review denied sub nom. Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C.Cir.1987).

Although the Act requires Commission approval for most trackage-rights and lease agreements, it denies the Commission jurisdiction over transactions concerning certain classes of track. These exceptions to Com-

mission jurisdiction, contained in subsections 10907(a) and 10907(b)(1), provide as follows:

(a) Notwithstanding sections 10901 and 10902 and subchapter III of chapter 113 of this title, and without the approval of the ... Commission, a rail carrier providing transportation subject to the jurisdiction of the Commission ... may enter into arrangements for the joint ownership or use of spur, industrial, team, switching, or side tracks.

(b) The Commission does not have authority under sections 10901–10906 of this title over—

(1) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching or side tracks if the tracks are located entirely in one state. . . .

49 U.S.C. §§ 10907(a)-(b)(1) (1994). If the ICC decides that a transaction otherwise covered by section 11343 falls within the exception to its jurisdiction in subsection 10907(a), then the Commission is not required—indeed, it has no authority—to impose the labor-protective arrangements required by section 11347. That is what happened in the Omaha–Council Bluffs decisions. Because the *Richmond Belt* case involved section 10901, mandatory labor-protective arrangements were not at issue in that case.

Even if the ICC decides that a transaction falls within its jurisdiction—that is, that it is not excepted under subsections 10907(a) or 10907(b)(1)—it may reduce its regulatory scrutiny by exempting the transaction from certain provisions of the Act. The Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, § 207, 90 Stat. 31, 42, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, § 101, 94 Stat. 1895, 1897–98, directed the Commission to exempt from regulation all transactions over which regulation is not necessary to carry out one of the procompetitive goals of the amended Interstate Commerce Act and which either are limited in scope or do not involve an abuse of market power that threatens shippers. 49 U.S.C. §§ 10101a, 10505(a) (1994). Responding to this legislative mandate, the Commission has issued a series of rules providing blanket exemptions for several classes of transac-

tions, including most trackage-rights agreements. *See, e.g., Ex Parte No. 392,* 1 I.C.C.2d 810 (1985); *Ex Parte No. 282 (Sub-No. 9), Railroad Consolidation Procedures—Trackage Rights Exemption,* 1 I.C.C.2d 270 (1985), *review denied sub nom. Illinois Commerce Comm'n v. ICC,* 819 F.2d 311 (D.C.Cir.1987); 49 C.F.R. §§ 1150.31–35, 1180.2 (1995). Under these class exemption rules, the parties need only file certain basic information about the transaction with the Commission showing that the transaction meets the appropriate rule's requirements; the transaction may then proceed without Commission investigation or authorization. However, the ICC retains jurisdiction over the transaction, and the parties may lose their exemption if the Commission finds that they have violated one of the requirements established by the class exemption rule. The trackage-rights class exemption, for example, requires parties to include the standard labor-protective provisions in their trackage-rights agreements. 49 C.F.R. § 1180.2(d) (1995).

Two of the challenged transactions in these cases involve the Union Pacific Railroad's Omaha–Council Bluffs terminal area. Council Bluffs, Iowa and Omaha, Nebraska lie just across the Missouri River from each other, with Council Bluffs on the east and Omaha on the west. Union Pacific owns and operates rail yards in both cities. The yards are linked by about five miles of Union Pacific's main rail line. Under an agreement with the Brotherhood of Locomotive Engineers, Union Pacific operates the Council Bluffs and Omaha yards as a single combined terminal for switching operations performed by yard crews.

The first transaction the Unions challenge is a trackage-rights agreement between Union Pacific and the Chicago Central Railroad. Like Union Pacific, Chicago Central owns and operates a rail yard in Council Bluffs. In 1985, Chicago Central began shipping flour for ConAgra, a company whose elevator is located near Union Pacific's yard in Omaha. Union Pacific crews moved the ConAgra shipments from ConAgra's elevator siding to Union Pacific's Omaha yard, and then to Union Pacific's Council Bluffs yard. Once in

Council Bluffs, the cars were transferred to the Chicago Central yard, where they were coupled to Chicago Central trains bound for Chicago. Because this process delayed shipments, Union Pacific agreed to allow Chicago Central's crews to use Union Pacific's main line between Council Bluffs and Omaha to travel to Omaha themselves, pick up the cars from ConAgra's elevator, and haul them back to Chicago Central's yard in Council Bluffs. In other words, although the cars would follow the same route, Chicago Central crews would move them throughout the process.

Without seeking ICC approval, the railroads formalized their agreement in early 1992. The Locomotive Engineers' Union, some of whose members work in the Council Bluffs and Omaha railroad yards, filed a complaint with the Commission, arguing that the agreement required ICC approval. The Commission disagreed, finding that the transaction fell within the switching-track exception to its jurisdiction. *Brotherhood of Locomotive Eng'rs v. Union Pac. R.R. Co.,* Finance Docket No. 32127, 1993 WL 418083 (ICC Oct. 12, 1993) [*Chicago Central I*], *reh'g denied,* 1995 WL 294224 (ICC Apr. 27, 1995) [*Chicago Central II*].

The second ICC decision under review also concerns a trackage-rights agreement in Union Pacific's Omaha–Council Bluffs terminal area. The Iowa Interstate Railroad's east-west main line runs from Chicago to Council Bluffs. At its terminal in Council Bluffs, Iowa Interstate operates an intermodal ramp, a facility that transfers containers and trailers between trains and trucks. Union Pacific operates an intermodal ramp at its yard in Omaha.

Because Union Pacific's intermodal ramp is more modern than Iowa Interstate's, and because it is more convenient to Iowa Interstate's trucking company customers, Union Pacific agreed to allow Iowa Interstate's crews to travel over approximately 3.4 miles of Union Pacific's main line between Iowa Interstate's yard in Council Bluffs and Union Pacific's intermodal ramp in Omaha. Under the agreement between the two carriers, loading and unloading at the ramp is performed by a contractor hired by Union Pacific. The movement of cars to and from the ramp is carried out by Iowa Interstate yard crews. As in the *Chicago Central* case, the railroads did not file the agreement with the ICC. Again, the Brotherhood of Locomotive Engineers urged the ICC to review the transaction, and again the ICC held that it lacked jurisdiction. *Brotherhood of Locomotive Eng'rs v. Union Pac. R.R. Co.,* Finance Docket No. 32394, 1995 WL 646763 (ICC Oct. 25, 1995) [*Iowa Interstate*].

The third challenged ICC decision concerns a strip of rail line known as the Richmond Belt. Constructed in the first decade of the century, the Belt runs along a promontory jutting into the San Francisco Bay near Richmond, California. Starting in 1905, the owner of the Belt leased it jointly to the Southern Pacific and the Atchison, Topeka & Santa Fe, which operated it in alternating years. In 1932, in a transaction authorized by the ICC, Southern Pacific's parent company and the Santa Fe purchased the Belt outright. *Southern Pac. R.R. Co. et al. Acquisition,* 184 I.C.C. 189 (1932). The two railroads continued their joint operating agreement, though they eventually lengthened the term for the alternating periods of operation to five years.

Running a total of about six miles, the Richmond Belt has always served the companies with plants along its line. In 1929, six businesses used the Belt. By 1990, the number had declined to three, the principal one being Chevron USA, which operates a large refinery adjacent to the Belt. In 1990, Chevron agreed to lease the Belt and the accompanying yards from Southern Pacific and the Santa Fe and to hire a railroad services contractor to operate the Belt.

The railroads and Chevron did not seek ICC approval for their leases. After the Brotherhood of Locomotive Engineers, eventually joined by the United Transportation Union, complained to the ICC, Chevron made two simultaneous submissions to the Commission: one acknowledging jurisdiction but seeking exemption from regulation pursuant to subsection 10505(a), and the other moving to dismiss the first petition for lack

of jurisdiction pursuant to subsection 10907(b)(1). Relying on its *Chicago Central* decision, the Commission found that the Richmond Belt transaction fell within the switching-track exception to its jurisdiction. *Chevron USA, Inc.—Lease and Operation Exemption—Richmond Belt Ry.*, Finance Docket No. 32352, 1995 WL 348739 (ICC May 25, 1995) [*Richmond Belt*].

## II

We begin with the Board's challenge to the Unions' standing to seek review of the *Iowa Interstate* and *Richmond Belt* decisions. At oral argument, the Board seemed less than enthusiastic about its standing argument in the *Iowa Interstate* case, and with good reason—that challenge is meritless. We agree with the Board, however, that the Unions lack standing to seek review of the *Richmond Belt* decision. The Board does not question the Engineers' Union's standing to challenge the *Chicago Central* decision, and we see no reason to doubt the Union's standing in that case.

■ In evaluating standing, we apply a series of well-known and settled standards. Only a "party aggrieved" by an ICC final order may seek judicial review. 28 U.S.C. §§ 2321, 2344 (1994). This statutory aggrievement standard incorporates constitutional and prudential standing requirements elaborated in other contexts. The statute's use of the term "party" rather than "person," however, imposes one additional prudential requirement: that the petitioner demonstrate party status. *See, e.g., Southern Pac. Transp. Co. v. ICC*, 69 F.3d 583, 587–88 (1995); *Simmons v. ICC*, 716 F.2d 40, 42–43 (1983). Normally satisfied by a petitioner's more than de minimis participation in the agency proceedings under review, *see Southern Pac. Transp.* Co., 69 F.3d at 587–88, this standard is clearly met in these cases.

■ Article III of the Constitution establishes three essential requirements for standing: "that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996) (citations

omitted); *see also, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). The injury alleged must involve "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' " *Id.* at 560, 112 S.Ct. at 2136 (citations omitted).

■ Supplementing these constitutional requirements is a series of prudential restrictions, the most important being that the "interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *see also Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395–97, 107 S.Ct. 750, 754–56, 93 L.Ed.2d 757 (1987). Where, as here, the petitioner is a union proceeding on behalf of its members, a further set of prudential restrictions comes into play. The union must credibly allege that its members would have standing to bring the action individually, that the union seeks to protect interests related to its mission as a union, and that the action does not require the participation of individual members. *See, e.g., United Food & Commercial Workers*, —— U.S. at ——, 116 S.Ct. at 1534; *International Union, UAW v. Brock*, 477 U.S. 274, 281–88, 106 S.Ct. 2523, 2528–32, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The Board questions only whether any Union members have in fact been injured by the Richmond Belt and Iowa Interstate transactions. In support of its argument, the Board points out that the Unions have failed to identify any particular members who have been harmed. We think the Board misconstrues the nature of the injury that arguably provides the basis for the Unions' standing in these cases. The injury at issue is not the job loss resulting from the transactions, but rather the loss of coverage by labor-protective arrangements flowing from the ICC's determination that the transactions fall out-

side its jurisdiction. Even where the prospect of job loss is uncertain, we have repeatedly held that the loss of labor-protective arrangements may by itself afford a basis for standing. *Redden v. ICC,* 956 F.2d 302 (D.C.Cir.1992); *Simmons v. ICC,* 934 F.2d 363 (D.C.Cir.1991).

The Board relies principally on *United Transportation Union v. ICC,* 891 F.2d 908 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990), where we held alleged injury based on predictions about future events too speculative to satisfy the injury-in-fact requirement. *UTU,* however, concerned a different portion of the Act—its requirement of ICC approval for establishment of interlocking directorates—and involved an extended "chain of allegations" not present here. *Id.* at 913.

Because *Simmons v. ICC, supra,* and *Redden v. ICC, supra,* address disputes over labor-protective arrangements, they are more relevant to the cases before us today. In *Simmons,* we considered a union's challenge to an ICC decision exempting a particular transaction from regulation. Whether and to what extent labor protection was required depended entirely on how the Commission characterized the transaction. "[T]he possibility" that one characterization of the transaction could lead to greater labor protection than another, we held, "yields sufficient potential for greater protection to [the] employees to provide a justiciable injury." *Simmons* at 367.

The following year, in *Redden,* we addressed a challenge to the ICC's exemption from regulation of a railroad abandonment where the labor-protective arrangements again depended on the Commission's characterization of the transaction. One view of the transaction would have afforded displaced workers an entitlement to receive information about job openings with the new operator of the railroad; the other would not have. Acknowledging that the difference between the possible labor-protective arrangements "might not seem like much," we nonetheless held that the loss of entitlement to information about job openings provided a sufficiently concrete injury to satisfy Article

III. *Redden* at 306. That this injury would "ripen" only if someone bought the railroad and only if the Commission determined the buyer to be a carrier did not make the injury too speculative to support standing. *Id.* at 307. Citing *Simmons,* we held that even if the actual usefulness of labor-protective arrangements depends on a future event, the injury is not too speculative to support standing. The future event need not even be likely; it need only be possible. *Id.* Under *Simmons* and *Redden,* then, as long as there is a reasonable possibility that union members will receive and benefit from labor-protective arrangements, the loss of those arrangements stemming from the Commission's refusal of jurisdiction over a transaction provides a sufficient basis for union standing.

■ Applying these standards in *Iowa Interstate,* we have no doubt that the Locomotive Engineers' Union has demonstrated injury-in-fact. For one thing, the labor-protective provisions at stake are mandatory. By itself, this creates an extremely strong presumption that Union members suffered a concrete and immediate injury when the ICC found it lacked jurisdiction. Moreover, because a reasonable possibility of job dislocation exists, labor-protective arrangements would have been meaningful and valuable. Admittedly, the work now performed by Iowa Interstate crews does not substitute for work previously performed by Union Pacific crews. As the Union points out, however, to the extent that Iowa Interstate and Union Pacific compete with each other to attract shippers, and to the extent that Iowa Interstate's direct access to Union Pacific's Omaha intermodal ramp makes it more attractive to shippers, the agreement may enable Iowa Interstate to take business from Union Pacific, which could, in turn, lead to displacement of Union Pacific employees. Moreover, and of considerable significance to our thinking, the parties themselves had included labor-protective provisions in an early version of their agreement, but dropped them from the final agreement. Taken together, these considerations suggest that the prospect of job displacement that would make labor-protective arrange-

ments meaningful is no more remote here than was the contingency considered sufficient for standing in *Redden.*

*Richmond Belt* presents a closer question. Because the transaction would clearly be governed by section 10901 if it fell within the Commission's jurisdiction, labor-protective provisions are purely discretionary. In this sense, the case is quite different from *Iowa Interstate*, where labor-protective arrangements were mandatory. In mandatory-protection cases, denial of jurisdiction necessarily entails a loss of labor protection; as long as there is any reasonable possibility of economic dislocation that would make such labor protection meaningful, workers who would have been protected suffer concrete and immediate injury when the Commission refuses jurisdiction. That is why the Engineers' Union has standing in *Iowa Interstate.*

■ In *Richmond Belt*, however, the imposition of labor-protective provisions cannot be taken for granted. The Unions must therefore show a reasonable possibility that the Commission would have required labor protection. This is a particularly difficult task for the Unions because, not only are labor-protective arrangements discretionary, but the Commission has made it clear that it will require labor protection in section 10901 cases only "in an extraordinary case" and upon "an exceptional showing of circumstances." *Ex Parte 392*, 1 I.C.C.2d at 815; *see also Knox & Kane R.R. Co.—Gettysburg R.R. Co.—Petition for Exemption Under 49 U.S.C. 10505 from 49 U.S.C. 10901, 11343, and 11301*, 366 I.C.C. 439, 443–44 (1982) (adopting policy of routinely denying labor protection in § 10901 cases). The Commission spelled out the criteria it would use in assessing "exceptional circumstances" in *FRVR Corp. FRVR Corp.—Exemption Acquisition & Operation—Certain Lines of Chicago & N.W. Transp. Co.—Petition for Clarification*, Finance Docket No. 31205, 1988 WL 225767 (ICC Jan. 28, 1988). The first two criteria—misuse of Commission rules or precedents and the existence of an agreement between the seller and its employees providing protection in the event of a line sale—are not present in this case, and the Unions make no allegation that they are.

The third criterion has three parts: the union must show injury that a) is unique; b) is "disproportionate to the gains achieved to the local transportation system"; and c) "can be compensated without causing termination of the transaction or substantially undoing the prospective benefits ... for other communities and locales." *Id.* at *2. Among the dozens of section 10901 cases the Commission has decided since the early 1980s, we have found only a handful where it has imposed labor-protective arrangements. Only two circumstances satisfy the Commission's third criterion. First, the Commission has found that the injury to labor is unique and disproportionate when a significant number of the selling carrier's employees face outright unemployment rather than mere displacement into less desirable jobs because the selling carrier is going out of business completely and the purchasing company cannot or will not offer them employment. *The Bay Line R.R., L.L.C.—Acquisition and Operation Exemption—Atlanta & St. Andrews Bay R.R. Co.*, Finance Docket No. 32435, 1995 WL 505877, at *3 (ICC Aug. 21, 1995); *New England Cent. R.R., Inc.—Acquisition and Operation Exemption—Lines Between E. Alburgh, VT and New London, CT*, Finance Docket No. 32432, 1994 WL 698768, at *22 (ICC Dec. 9, 1994). Second, the Commission has concluded that, when the parties to the transaction have already negotiated some level of labor protection, the imposition of these voluntarily adopted provisions will not hamper consummation of the transaction. *Central Ore. & Pac. R.R., Inc.—Lease, Operation, and Acquisition Exemption—S. Pac. Transp. Co.*, Finance Docket No. 32567, 1996 WL 56248, at *1–*2 (ICC Feb. 6, 1996); *Kokomo Rail Co., Inc. and Cent. R.R. Co. of Indianapolis—Acquisition and Operation Exemption—Line of CSX Transp., Inc. Between Marion and Amboy, Ind.*, Finance Docket No. 32231, 1993 WL 517295, at *4 (ICC Dec. 8, 1993); *P & LE Acquisition Corp.—Acquisition and Operation Exemption—Assets of the Pittsburgh & Lake Erie R.R. Co.*, Finance Docket No. 31607, 1990 WL 287902, at *7 (ICC Apr. 3, 1990).

Even when pressed at oral argument, the Unions did not allege the presence of either of these two conditions in the Richmond Belt

725

transaction. The lessor carriers, Southern Pacific and Santa Fe, remain in business, and employees shifted to other jobs because of the Chevron leases have, as counsel for the Unions acknowledged at oral argument, exercised their seniority rights to acquire jobs elsewhere in their employer's systems. The Commission has repeatedly held that this sort of displacement, as distinct from outright job loss, does not constitute an exceptional circumstance justifying labor protection in section 10901 cases. *See, e.g., Louisville & Indiana R.R. Co—Acquisition and Operation Exemption—Consolidated Rail Corp.,* Finance Docket No. 32440, 1995 WL 336000, at *8 (ICC May 26, 1995). Moreover, nothing in the record before us suggests that any of the parties to the transaction offered to provide labor protection. Had the Unions alleged the existence of any of the exceptional circumstances clearly identified by the Commission as necessary to justify labor protection in section 10901 proceedings, we would have a very different case. But because the Unions have not shown even a reasonable possibility that any of these exceptional circumstances is present, they have failed to establish that they suffered injury-in-fact when the Commission refused jurisdiction over the transaction.

### III

Because the Commission's decisions in the *Chicago Central* and *Iowa Interstate* cases turn on the agency's interpretation of a statute it is charged with administering, our review is governed largely by the familiar standards set forth in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). *See also, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 574, 108 S.Ct. 1392, 1396–97, 99 L.Ed.2d 645 (1988) (noting applicability of *Chevron* to administrative adjudications). The Locomotive Engineers' Union's argument that we should adopt a less deferential standard of review because the decisions concern the scope of the Commission's jurisdiction is without merit. *See, e.g., Reiter v. Cooper,* 507 U.S. 258, 269, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993) (applying

*Chevron* in accepting ICC interpretation concerning Commission jurisdiction); *Detroit/Wayne County Port Auth. v. ICC,* 59 F.3d 1314, 1315 (D.C.Cir.1995) (using *Chevron* analysis in reviewing jurisdictional decision by ICC); *Oklahoma Natural Gas Co. v. FERC,* 28 F.3d 1281, 1283 (D.C.Cir.1994) (collecting cases).

 The Interstate Commerce Act does not define the term at issue here, "switching track," nor does the Act's legislative history suggest a clear Congressional intent regarding the term's meaning. As directed by *Chevron,* we thus ask whether the Commission's definition of switching track is reasonable in light of the Act's language, purpose, and legislative history. *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–83; *Republican Nat'l Comm. v. FEC,* 76 F.3d 400, 404 (D.C.Cir.1996); *Detroit/Wayne County,* 59 F.3d at 1315–16.

The Commission's central holding in both cases is that whether a track is switching track—and thus outside Commission jurisdiction—turns on how the tenant railroad, i.e., Chicago Central or Iowa Interstate, uses the track. The Commission put it this way in its first *Chicago Central* decision:

> Whether particular operations fall within our jurisdiction over the acquisition of trackage rights under 49 U.S.C. 11343(a)(6) depends on the use to be made of the track by the carrier acquiring rights to operate over the track, not on the classification of the tracks by the lessor.... If the sole use of the leased track by the lessee is switching, we have no jurisdiction over the transaction.

*Chicago Central I* at 2–3, 1993 WL 418083, at *2. Accordingly, although the tracks at issue were main-line Union Pacific tracks, because the tenant carriers used them solely for switching, the Commission ruled the agreements beyond its jurisdiction.

The Locomotive Engineers' Union argues that the Commission's use test is inconsistent with the statute's plain language because the statute refers to "switching *tracks,*" not to switching operations. We do not think the Act's use of the word "track" requires the Commission to define "switching track" on

the basis of physical qualities or geographic layout. Indeed, we have previously approved the ICC's focus on use. In *Nicholson v. ICC*, 711 F.2d 364 (D.C.Cir.1983), *cert. denied*, 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984), we upheld the Commission's refusal of jurisdiction over the construction of a yard for breaking up and reassembling trains based on the switching-track exception. We observed that it was "well established that the determination of whether a particular track segment is a 'railroad line' ... or a '... switching ...' track ... turns on the intended use of the track segment, not on the label or cost of the segment." *Id.* at 367. Two earlier cases from the Fifth and Sixth circuits also endorse a use test. *New Orleans Terminal Co. v. Spencer*, 366 F.2d 160, 165–66 (5th Cir.1966) (holding that tracks' predominant use for through movement of freight brings their abandonment within ICC jurisdiction), *cert. denied*, 386 U.S. 942, 87 S.Ct. 974, 17 L.Ed.2d 873 (1967); *ICC v. Memphis Union Station Co.*, 360 F.2d 44, 50–51 (6th Cir.1966) (concluding that "the use of these tracks as an integral part of railroad systems developed to accommodate interstate commerce" determines their jurisdictional status), *cert. denied*, 385 U.S. 830, 87 S.Ct. 66, 17 L.Ed.2d 66 (1966). The Fifth Circuit again approved this approach in a more recent case concerning terminal tracks near the port of Galveston, Texas. *Railway Labor Executives Ass'n v. City of Galveston*, 849 F.2d 145, 148 (5th Cir.1988) (holding that jurisdictional status of track determined by use and intended use), *vacated on other grounds*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 559 (1989).

The Union, then, cannot seriously question the Commission's reliance on a use test. Indeed, by arguing that the character of the track should be determined by Union Pacific's use of the track as main line, the Union concedes the appropriateness of some sort of use test. The Union's disagreement with the Commission is thus not over the agency's reliance on use, but over which carrier's use controls when two carriers use the track in different ways. Our decision in *Nicholson* did not confront this situation nor have any other circuits.

Although the Commission has not squarely addressed this dual-use situation in some time, when it did so several decades ago, it focused, as it does here, on the tenant railroad's use as the controlling factor in determining the character of the track. *See St. Louis, San Francisco & Texas Ry. Co. Trackage Rights*, 267 I.C.C. 30, 35–36 (1946) (applying tenant-use principle); *Central R.R. Co. of N.J. Trustees Acquisition of Trackage Rights*, 254 I.C.C. 344, 348 (1943) (definitively stating tenant-use principle); *Texas & Pac. Ry. Co. et al. Operation*, 247 I.C.C. 285, 291 (1941) (relying on tenant-use principle); *see also International–Great Northern R.R. Co. Trustee Trackage Rights*, 275 I.C.C. 27, 37 (1949) (applying tenant-use test but finding tenant carrier's use to be through movement, not switching); *cf. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., Debtor, Acquisition and Operation of Trackage at Winnebago, MN*, 360 I.C.C. 279, 286 (1979) (applying analogous principle in acquisition). We see no basis for concluding that the Commission's reliance on the tenant's use for determining the identity of switching track is less reasonable than any other possible method—such as relying on the landlord carrier's use—or is inconsistent with the Act. Indeed, the Commission's choice seems perfectly sensible to us.

The Union argues that the Commission's early precedents are distinguishable from the cases at hand. In the *St. Louis, San Francisco & Texas* case, the Union contends, the switching was minor compared to the switching operations in *Chicago Central* and *Iowa Interstate*. In the *Central New Jersey* case, the Union suggests, while the landlord carrier characterized the track as main line, it used the track only for switching. We are not persuaded by either of these distinctions. The first is of little significance. The accuracy of the second, as the Commission notes, is unclear from the text of the *Central New Jersey* decision, but in any case did not figure in the Commission's holding, which itself makes clear that the Union's claim is meritless: "[O]ur jurisdiction over acquisitions of trackage rights is controlled by the use to be made by the applicant of the tracks involved, and not by *the use made thereof*, or the classification thereof, *by the carrier or carri-*

ers which own the tracks." *Central R.R. Co. of N.J.*, 254 I.C.C. at 348 (emphasis added).

Although we find solid support for the Commission's tenant-use test, the Supreme Court's decision in *Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co.*, 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926), suggests one important qualification. In *Texas & Pacific*, the Court rejected the ICC's reliance on the spur- or industrial-track exception to avoid jurisdiction over construction of a track segment even though the segment was not part of a through line and would only be used to serve industrial shippers located along it. Looking beyond the immediate use of the track segment, the Court examined the "purpose and effect" of its construction. "If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory," Justice Brandeis wrote for the Court, then the trackage qualifies as "an extension of the railroad" within the ICC's jurisdiction and could not be excepted from that jurisdiction. *Texas & Pacific*, 270 U.S. at 278, 46 S.Ct. at 266.

■ *Texas & Pacific* thus places a limit on the ICC's reliance on a tenant-use test. While the Commission may look to the tenant's use as the controlling factor determining the character of track for the purpose of finding exceptions to its jurisdiction, it may not allow its focus on use to obscure the larger purpose and effect of the transaction at issue. In the cases before us, for example, although the ICC may focus on the tenant railroads' use of the tracks solely for switching operations as the controlling factor in determining the tracks' character, if those switching operations have the effect of substantially extending the tenant railroads' lines into new territory, then the Commission may not decline jurisdiction.

Notwithstanding *Texas & Pacific's* clear requirements, the Commission suggested in its second *Chicago Central* decision that it "need not determine whether the 'service extension' test ... is valid." *Chicago Central II* at 4, 1995 WL 294224, at *4. To the extent this statement questions the vitality or relevance of *Texas & Pacific's* holding, it is wrong. But we think this error was of no

consequence in this case, for as we read the Commission's decision, it went on to apply the *Texas & Pacific* standard properly. The Commission observed that Chicago Central had begun serving as ConAgra's long-haul carrier in 1985, more than six years before it entered into the trackage-rights agreement with Union Pacific. During that time, Union Pacific crews provided the switching service that moved ConAgra's cars between its elevator in Omaha and Chicago Central's yard in Council Bluffs. Accordingly, the Commission concluded, the Union Pacific–Chicago Central trackage-rights agreement did not make it possible for Chicago Central to reach any new customers or territory. Instead, the agreement simply allowed Chicago Central to serve a longstanding customer more efficiently. As the Commission stated, "CCP's service to Elevator B, performed at ConAgra's request, is a substitute for the switching service provided by UP in the past." *Chicago Central I* at 4, 1993 WL 418083, at *2. Reaffirming this conclusion in its decision denying the Union's petition to reopen, the Commission stated, "While the substitution of switching carriers allowed CCP to serve ConAgra's plant more efficiently by avoiding the need for an intermediate switching carrier, it did not allow CCP to serve any destinations that were not previously being served through switching provided by UP." *Chicago Central II* at 4, 1995 WL 294224, at *4. According to the Commission, the Union had failed to identify a single new shipper or any new territory that the trackage-rights agreement allowed Chicago Central to serve. *Id.* at 5, 1995 WL 294224, at *4.

In its *Iowa Interstate* decision, though again failing to mention *Texas & Pacific*, the Commission took account of the extension-into-new-territory test. As in *Chicago Central*, the Commission concluded that the trackage rights acquired by the tenant railroad allowed it to serve its existing territory more effectively rather than enabling it to reach new customers:

> ... IAIS's operation over UP track does not result in reaching or serving any new shipper facility, an invasion of UP territory by IAIS, or in the diversion of traffic

handled by UP crews to the IAIS. Indeed, intermodal ramps, by their very nature, permit rail carriers to serve those shippers who are not located immediately on their lines. For this reason, we find unpersuasive BLE's argument that a 3.4–mile shift in intermodal ramps can lead to an invasion of another territory and facilitate service to new shippers. In our opinion, a 3.4–mile shift in an intermodal ramp is virtually inconsequential and unlikely to make a significant difference in shipper access.

*Iowa Interstate* at 4, 1995 WL 646763, at *4. Although the possibility of Iowa Interstate's gaining increased shipper access is sufficient to give the Locomotive Engineers' Union standing, we agree with the Commission's judgment that the prospect of increased business for Iowa Interstate is highly unlikely. We thus think the Commission reasonably found that Iowa Interstate's access to Union Pacific's intermodal ramp does not amount to the sort of "invasion ... of territory" contemplated by the Supreme Court in *Texas & Pacific*. *Texas & Pacific*, 270 U.S. at 278, 46 S.Ct. at 266.

As a final ground for challenging the reasonableness of the ICC's tenant-use test, the Engineers' Union argues that it frustrates a central policy goal of the Act—labor protection. We agree that protection for railroad workers remains an important, if secondary, goal of the Act. *See* 49 U.S.C.App. §§ 11347, 10101a(11) (1994). But the availability of labor-protective arrangements is determined by the scope of the Commission's jurisdiction, not the other way around. Loss of labor protection does not justify rejecting the Commission's reasonable interpretation of the switching-track exception to its jurisdiction, an interpretation it has maintained for more than fifty years.

We conclude, then, that the Commission's qualified tenant-use test represents a permissible way to define switching track where, as in these cases, landlord and tenant carriers use the track for different purposes. Accepting tenant use as the primary factor in determining whether track is switching track, however, brings us only halfway to the resolution of these cases. The question remains:

How does one determine that the purpose for which a tenant uses the track is in fact switching? Because the resolution of this question depends largely on the Commission's railroading expertise, we approach it with considerable deference to the agency's judgment. We examine the Commission's factual findings to ensure that they are supported by substantial evidence in the record. 5 U.S.C. § 706(2)(E) (1994). We reject the Commission's applications of its statutory interpretation to the facts of the cases before it only if those applications are arbitrary or capricious, i.e., if they are unsupported by reasoned analysis. *Id.* § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *United Transp. Union v. United States*, 905 F.2d 463, 467–68 (D.C.Cir.1990).

In its initial *Chicago Central* decision, the Commission characterized Chicago Central's operation under its trackage-rights agreement with Union Pacific in the following way:

> The railroad cars that serve ConAgra's Elevator B at Omaha are moved by a switch locomotive and a switch crew and come to rest at the CCP Council Bluffs yard both before and after the move over UP's track. The sole use of the UP track by CCP is for switching. The movement over the UP track is a yard operation within the Omaha–Council Bluffs terminal area, not a part of the line haul movement.... At Council Bluffs, CCP assembles ConAgra's cars with the cars of other shippers into a road train for transport to the East. Only at this point does the nature of CCP's operations change to line haul service.

*Chicago Central I* at 3–4, 1993 WL 418083, at *2. Put another way, the Commission found the movement of ConAgra's cars between its elevator siding and Chicago Central's Council Bluffs yard distinct from the movement of the through train those cars join for the journey between Council Bluffs and Chicago. Rather than being part of that train's continuous through passage, the movement of the ConAgra cars within the Omaha–Council Bluffs terminal area amounts to an assembling or disassembling operation. Spelling

out these considerations in its second *Chicago Central* decision, the Commission noted that:

> (1) the traffic at issue ... involv[es] the movement of cars solely for the assembly or disassembly of trains; (2) the cars ... come to rest before and after movement to and from ConAgra's plant; and (3) the outgoing assembled trains ... or incoming trains to be disassembled ... [are] composed of cars serving other shippers and destinations as well as cars serving ConAgra's plant.

*Chicago Central II* at 3–4, 1995 WL 294224, at *3. These findings are supported by the text of the Union Pacific–Chicago Central agreement and by the affidavits in the record from Union Pacific employees.

The Union argues that Chicago Central's operation over Union Pacific's track, though called switching, is really part of through movement because it is necessary to get the cars from their starting point to their destination. In support of this argument, the Union relies on *Nicholson*, where we defined switching by contrasting it to through movement:

> [T]rack segments which are intended to be used to carry through trains between points of shipment and delivery, particularly those segments which extend a railroad's service into new territory, must be approved by the Commission pursuant to section 10901(a). On the other hand, track segments which are merely incidental, and not required for, a railroad's service between points of shipment and delivery are exempted from the requirements of section 10901(a) by section 10907(b)(1).

*Nicholson*, 711 F.2d at 368. *Nicholson* does not support the Union's argument. For one thing, because *Nicholson* concerned a side yard used only for assembling and disassembling trains, we had no occasion to address the type of switching operations involved in this case—switching used to move cars between their point of connection with long-haul trains and their ultimate place of loading or unloading. Moreover, Chicago Central does not use the tracks involved in this case to "carry through trains," *Id.* at 368;

Chicago Central's through trains begin or terminate at Council Bluffs.

The Fifth Circuit's decision in *New Orleans Terminal*, also relied on by the Union, is equally distinguishable. There, the tracks at issue connected major freight lines on opposite sides of the city, and their predominant use was for the uninterrupted passage of long-haul trains. *New Orleans Terminal*, 366 F.2d at 165–66. That situation is quite different from this one. Chicago Central's long-haul trains begin or end their journeys in Council Bluffs; the operations at issue take place before or after those journeys.

■ We thus find nothing in *Nicholson* or *New Orleans Terminal* inconsistent with the Commission's characterization of the operations at issue in *Chicago Central* as switching rather than through movement. Those operations involve the discrete movement of groups of cars for assembling with or disassembling from entire trains; the movements take place largely, if not exclusively, within a terminal area; and they occur before or after entire trains make their continuous long-haul journeys between terminal points. Moreover, the Commission's view accords with its own longstanding classification of switching movements. *See Sioux City Terminal Ry. Switching*, 241 I.C.C. 53, 90 (1940) (footnotes omitted) (defining switching, in relevant part, as "all movements of railway cars and locomotives in yards or at way stations, except movements in road trains running between stations"). Although Chicago Central's operation over Union Pacific's track is, in a literal sense, necessary to move the cars from their starting point to their destination, the operation is not part of a train's through movement, but instead is an operation taking place just before or just after the train's through passage. *Cf. Illinois Commerce Comm'n v. ICC*, 779 F.2d 1270, 1273 (7th Cir.1985) (making similar distinction under spur-track exception to Commission jurisdiction).

In *Iowa Interstate*, the Commission followed the same approach, characterizing the trackage-rights agreement as allowing only for switching operations:

> ... IAIS uses switch engines and crews to move traffic to and from UP's Omaha in-

termodal ramp for loading or unloading. IAIS's switching jobs are functionally separate and distinct from its road crew operations, and the flatcars come to rest at both the Council Bluffs yards and the Omaha intermodal ramp. For operational and tariff purposes, the movement is solely within the Omaha/Council Bluffs switching terminal.

*Iowa Interstate* at 3, 1995 WL 646763, at *3 (footnote omitted). The Commission's factual claims are amply supported by the record. As in *Chicago Central,* the essential element justifying the denial of jurisdiction is the Commission's finding that the transfer of intermodal cars between the Union Pacific ramp and Iowa Interstate's yard is not part of a continuous through movement. Rather, the transfer of cars, discrete from through movement, enables Iowa Interstate to assemble those cars for through shipment from Council Bluffs to Chicago or to disassemble those cars from trains after the trains have made the through movement from Chicago to Council Bluffs.

### IV

Finding that the Unions failed to establish that any of their members was threatened with constitutionally sufficient injury in the *Richmond Belt* case, we dismiss that petition for lack of standing. Although the Locomotive Engineers' Union does have standing in the *Chicago Central* and *Iowa Interstate* cases, we deny those petitions on the merits.

*So ordered.*