UNITED TRANSPORTATION UNION–
ILLINOIS LEGISLATIVE
BOARD, Petitioner,

v.

SURFACE TRANSPORTATION BOARD
and United States of America,
Respondents,

and

Chicago Rail Link, L.L.C. and Union
Pacific Railroad Company,
Intervening Respondents.

No. 98–1469.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1998.

Decided Feb. 25, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied May 14, 1999.*

---

* The Honorable Walter J. Cummings, a member of the original panel, authored the opinion but died before casting a vote on the petition for rehearing.

Gordon P. MacDougall (argued), Washington, DC, for United Transportation Union–Illinois Legislative Board.

Henri F. Rush, Surface Transportation Board, Washington, DC; Robert J. Wiggers, Department of Justice, Antitrust Division, Appellate Section, Washington, DC, for United States of America.

Theodore K. Kalick (argued), Surface Transportation Board, Office of the General Council, Washington, DC, for Surface Transportation Board.

Karl Morell, Washington, DC; Joseph D. Anthofer, Omaha, NE, for Chicago Rail Link and Union Pacific Railroad Company.

Before CUMMINGS, KANNE and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

In December 1996, Chicago Rail Link, a small Class III carrier, *i.e.*, one doing less than $20 million of business a year, leased 15 tracks in Union Pacific Railroad's Irondale Yard in Chicago, Illinois. This transaction effectively transferred operation of the Irondale Yard to Chicago Rail Link. The purpose of the lease was to enable Chicago Rail Link to perform switching operations and to reach new shippers. The lease and transfer went into effect in January 1997.

Such a transaction normally would require approval by the Surface Transportation Board (the "Board"), the successor to the Interstate Commerce Commission ("ICC"), which was abolished in 1996. Class II and Class III carriers must have Board authorization, involving satisfaction of various regulatory conditions, to enter into transactions to acquire or operate additional rail lines, see 49 U.S.C. § 10902, unless they obtain an exemption. Chicago Rail Link requested an exemption available under recent deregulatory initiatives which allow the Board to exempt a transaction or a class of transactions from this authorization requirement. See 49 U.S.C. § 10502(a); *see also* 49 C.F.R. Part 1150, Subpart D, §§ 1150.31–1150.36. Such exemptions are available and effective automatically seven days after filing. See *id.* § 1150.41 *et seq.*; see also *Class Exemp. for Acq. or Oper. Under 49 U.S.C. § 10902*, 1 S.T.B. 95 (1996), aff'd. sub nom. *United Transp. Union–Ill. v. STB*, 132 F.3d 1482, 1997 WL 812460 (D.C.Cir.1997) (unpublished opinion).

The Board's exemption freed Chicago Rail Link from a number of regulatory conditions it found onerous, including, among other things, certain labor protective conditions covering rail employees whose interests might be harmed by the transaction. Understandably, therefore, the United Transportation Union–Illinois Legislative Board (the "Union") was interested in the matter. Under 49 U.S.C. § 10502(d), such an exemption may be revoked upon a proper showing that regulation of the track is necessary to carry out federal rail transportation policy. Labor interests may be grounds for a revocation. See 49 U.S.C. § 10502(g). The Union filed a petition to revoke the exemption. According to the Union, the transaction should have been governed by one or another of two statutes which impose labor protective conditions on Chicago Rail Link.

The Union argued before the Board, first, that the tracks were not "rail line" under 49 U.S.C. § 10902 but "spur, industrial, team, switching, or side tracks" (hereinafter "spur" tracks). Under § 10906 spur tracks are excepted from the scope of Board authority under § 10902. If the track is excepted, then the Board may not grant an exemption from its required approval of the transaction. The applicable provision under which the Board administered the track in question, according to the Union, was not § 10902 but § 11323, under which the employee protective conditions desired by the Union arguably would apply if the track fell under the § 10906 exception. Second, the Union argued that even if the track is rail line under § 10902, Board authority under § 10902 or the Class II class exemption does not extend to leases of track, as opposed to certain other sorts of transfers such as outright purchase. Therefore, the Union contended, § 11323 governs and its labor protective conditions apply. The Board rejected these arguments and refused to revoke the exemption. When the Board declined to reconsider its determination, the Union filed this petition for review.

■ We review the determination of the Board regarding the proper characterization of the tracks as rail line or spur under the high level of deference accorded to an agency's reasonable interpretation of the statutes which the agency administers. See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. "Under Chevron deference we apply a two-step analysis: (1) If the plain meaning of the [statutory] text either supports or opposes the [agency's interpretation], then we stop our analysis.... But if ... the statute is either ambiguous or silent on the issue, we continue to the second step. (2).... If the [construction] is a reasonable reading of the statute, we give deference to the agency's interpretation." *Bankers Life and Casualty Co. v. United States*, 142 F.3d 973, 983 (7th Cir.1998); see also *Ass'n of American Railroads v. Surface Transportation Board [STB]*, 162 F.3d 101, 103 (D.C.Cir.1998) (applying *Chevron* deference to the Board's interpretations of the ICC

Termination Act); see also *In re Transcon Lines*, 89 F.3d 559, 566 (9th Cir.1996) (same).

■ When exercising *Chevron* deference in the context of interpreting an ambiguous or unclear statute, the agency acts as a congressional proxy. Congress develops the statutory framework and directs the agency to flesh out the operational details. *Bankers Life and Casualty*, 142 F.3d at 980. Congress may delegate to the agency the authority to make the legal interpretations at issue. *Condo v. Sysco Corp.*, 1 F.3d 599, 604 (7th Cir.1993). This is in part because specialist agencies are more qualified than generalist courts to handle technical matters within their purview. They are the experts. Court second-guessing of administrative decisions typically " 'do[es] not make [for] better technical decisions than [those of] agencies.' " *United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1407 (7th Cir.1990) (quoting F. Heffron & N. McFeeley, *The Administrative Regulatory Process* 314 (1983)).

Since invocation of *Chevron* is generally decisive, the Union of course argues that the Board is entitled to little deference about whether something is rail line or spur track. According to the Union, we are to decide whether the spur track exception applies here under a de novo standard of review. The Union has three arguments for this view. First, the Union cites to a good many pre-*Chevron* cases from several Circuits and the Supreme Court, some going back to the 1930s. To the extent that these cases might support a more rigorous standard of review than *Chevron*, it is not clear why they are still relevant. We would need a powerful explanation why they have not been superseded by *Chevron*. The Union gives us no reason to suppose that the older cases have continuing validity today.

Second, the Union cites one post-*Chevron* case, namely, *Illinois Commerce Comm'n v. United States*, 779 F.2d 1270 (7th Cir.1985). There we held that a determination of the ICC, the Board's predecessor agency, that certain track was rail line rather than spur track, was insufficiently supported by reasoned analysis and so we remanded the case to the agency. *Id.* at 1272. But even there, and with respect to the standard of review,

we said that the ICC's "expertise, of course, entitles its determination to the greatest deference." *Id.* at 1271. Great deference, even *Chevron* deference, is not abject deference. See Sanford N. Caust–Ellenbogen, *Blank Checks: Restoring the Balance of Powers in the Post–Chevron Era*, 32 *B.C.L.Rev.* 757, 761 (1991) (A "strong" or "rubber stamp" reading of *Chevron* should be rejected because, among other reasons, "it produces bad policy outcomes[ ] and rests on shaky doctrinal foundations."). Under part two of the *Chevron* analysis, the agency interpretation must be reasonable, *Bankers Life and Casualty*, 142 F.3d at 983. We held that it was not reasonable in *Illinois Commerce Comm'n*, but that precedent offers no support in this case for a less deferential standard of review than *Chevron*.

■ Third, the Union seems to argue that the Board is not entitled to any deference whatsoever in passing upon its own jurisdiction. We have indeed held that an administrative agency's determination about the scope of its own jurisdiction, " 'a matter within the peculiar expertise of the courts,' " does not receive *Chevron* deference but is reviewed de novo. *Midland Coal Co. v. Director, Office of Workers' Comp. Programs*, 149 F.3d 558, 561 (7th Cir.1998) (internal citation omitted) (*Chevron* deference "does not extend" to questions of an agency's jurisdiction). But the point is inapposite here. No one, including the Union, disputes that the Board has jurisdiction over the track at issue. The Board could not impose the employee protective conditions which the Union seeks if it lacked all jurisdiction.[1] The dispute here is not whether there is Board jurisdiction, which would receive de novo review, but under which provision of the statutes administered by the Board it exercises the jurisdiction it undisputedly has.[2] When one among several statutes that an agency administers undisputedly applies, but it is

unclear from the plain language of the statute itself precisely which one is applicable, the agency's choice among which of the several statutes to apply is not a jurisdictional but an interpretative decision that is located squarely in the heartland of *Chevron* deference. No special circumstances which might justify less deference in such a case are alleged here.

■ Since *Chevron* deference applies with regard to whether the disputed tracks may be found to be within the 49 U.S.C. § 10906 exception for spur tracks, and the Union did not argue that the statutory text plainly dictates that these tracks must be found to be within that exception, the remaining issue is whether the Board's decision is based on a reasonable construction of the statutory language. The Board concluded that it had jurisdiction under § 10902 over the disputed track as rail line, which track therefore fell outside of the § 10906 exception governing spur track. The Board reasoned that which of these sections to apply is to be established with reference to the intended use of the track in question. See *Nicholson v. ICC*, 711 F.2d 364, 367 (D.C.Cir.1983). The Board accepted the D.C. Circuit's view that in determining whether a particular track segment is excepted from Board jurisdiction under § 10906, it is the tenant railroad's use of the track that controls. See *Brotherhood of Locomotive Eng'rs v. U.S.*, 101 F.3d 718, 727–728 (D.C.Cir.1996). The Board noted that this tenant-use test must be qualified by an examination of the "purpose and effect" of the trackage, because the Supreme Court has said:

> If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad ... although the line be short and although the character of the service contemplated be that commonly rendered to

---

1. If the Union were right that the tracks in question are spur tracks, the Board would have "exclusive" jurisdiction over them under 49 U.S.C. § 10501(b)(2).

2. The Union asserts that the Board does not administer the statute here in dispute, the § 10906 exception, because it says that issues

involving that exception arise frequently in local and state courts. This unsupported claim is without merit. See 49 U.S.C. § 11701(b) (repealing a private right of action formerly available under a predecessor to § 10906); see also *id.* § 10501(b)(2) (preempting state regulation of spur track).

industries by means of spurs or industrial tracks.

*Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co.*, 270 U.S. 266, 278, 46 S.Ct. 263, 70 L.Ed. 578. The D.C. Circuit stated that "a focus on use [may not be allowed to] obscure the larger purpose and effect of the transaction at issue." *Locomotive Eng'rs*, 101 F.3d at 728.

The Board made the factual determination, not disputed here, that the tenant railroad, Chicago Rail Link, intends to extend its operations to reach new customers and not merely to serve existing customers more efficiently. In view of this coincidence of use, purpose and effect, the Board found that the transaction at issue here contemplates an extended or additional rail line, and that the disputed track was therefore rail line falling within the Board's § 10902 jurisdiction.

To overcome the great deference given under *Chevron* to agency interpretations of statutes they administer, the Union must show that the Board's interpretation set forth above is unreasonable. It has three arguments for this claim. First, the Union argues that the *Nicholson* case does not support the Board's conclusion that the use test requires the track in dispute to be classified as rail line, because the ICC, in the decision there under review, had generally found that construction or acquisition of yard track generally did not require ICC approval. See *Nicholson v. Missouri Pacific Ry.*, 366 I.C.C. 69, 72–73 (1982). But this does not come to grips with the issues that matter here, which are whether the use test is the appropriate test and whether Chicago Rail Link passes it when it is correctly applied. The language invoked by the Union is not quoted by the D.C. Circuit which, while agreeing with the ICC's determination there that the track there in question was excepted spur or switching track and not rail line, applied the use test with the "purpose and effect" gloss here used by the Board. See *Nicholson*, 711 F.2d at 368. In any case, we fail to see why the Board cannot come to different determinations in different factual circumstances. The Union does not even present us with a factually similar case where the Board either applied a different test or applied the use test and got a different result.

Second, the Union argues that the Board wrongly relied upon *Locomotive Eng'rs* for its tenant-use test, which directed the Board to Chicago Rail Link's intended use for the disputed track. That case is inapposite, the Union says, because Chicago Rail Link is not a "tenant" of Union Pacific. Since it is undisputed that Chicago Rail Link leases the Irondale Yards from Union Pacific, this is a puzzling claim, to say the least. See *Black's Law Dictionary* 1466 (6th ed.1990) (defining "tenant" as "one renting land" under an "instrument called a lease"). The Union argues that *Locomotive Eng'rs* addressed a case of joint use by two carriers, but since Union Pacific no longer operates in the Irondale Yard, Chicago Rail Link is the sole user and therefore, the Union concluded, it is not a tenant. But one cannot escape from the application of an appropriate legal category by appeal to an immaterial factual distinction. The Board was reasonable to rely on the normal meaning of "tenant" to encompass "lessee" and the Board's tenant-use test is reasonably applicable as far as the Union has shown.

Third, the Union argues with somewhat more plausibility that the Board used the wrong test altogether. Rather than the tenant-use test, the Union says, the Board should have used the "invasion" test it alleges was approved by this Circuit. According to that test, whether track is classified as rail line rather than spur track depends on whether the " 'purpose and effect of the new trackage is to extend substantially the line of the carrier into new territory.' " *Illinois Commerce Comm'n*, 779 F.2d at 1271 (quoting *Texas & Pacific Ry.*, 270 U.S. at 278, 46 S.Ct. 263). Applying that test, the Union urges, the track in question does not involve a "substantial invasion" into new territory (despite the fact that the Irondale Yard lease enables Chicago Rail Link to serve the tracks of two shippers it did not hitherto serve) and so is not a rail line under 49 U.S.C. § 10902.

We need not reach whether the disputed track could be reasonably interpreted to be rail line under the invasion test. In *Illinois*

*Commerce Comm'n* we did not adopt the invasion standard in place of the tenant-use test. We rather held there that the ICC's determination about the classification of the track was insufficiently supported under either test. We did remark that, while "courts have emphasized several factors in determining whether track is spur or line of railroad," the "use" test represents the modern approach and the "invasion" standard an older one. *Illinois Commerce Comm'n*, 779 F.2d at 1272. This modern preference for a modified tenant-use test incorporating the invasion concerns under "purpose and effect" qualifications has been followed by the D.C. Circuit in *Nicholson* and *Locomotive Eng'rs*. We cannot say that the Board was unreasonable either to rely on the modern tenant-use test merely because we referred to the older test in *Illinois Commerce Comm'n* or to determine that reaching two new shippers makes the track to be rail line under that tenant-use test.

The Union argued to the Board, and urges here, that even if the Irondale Yard tracks are not excepted spur tracks under 49 U.S.C. § 10906, it is error to say that they can be excepted from Board approval under 49 U.S.C. § 10902. The Union's best argument proceeds from the plain language of the statute itself which purportedly precludes the application of § 10902. By appealing to the statutory language, the Union seems to argue that our standard of review for this issue is de novo under the first prong of *Chevron*, where if "Congress has spoken directly to the precise point at issue," *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778, deference to even reasonable agency interpretation is inappropriate. It might be thought, however, that if on examination we find the statutory language to be ambiguous or silent with regard to the precise point at issue, *Chevron* deference is nonetheless called for, because a petitioner ought not be able to evade *Chevron* deference simply by alleging that the intent of Congress is clear when it is not. But we need not decide this issue about the appropriate standard of review. If the Union's claim fails under de novo review, it would also fail under *Chevron* deference. If it succeeded under de novo review, we would then have to consider whether it succeeds under

*Chevron* deference. In the present case the second step is unnecessary.

■ The direct statutory contention is that the Board wrongly invoked the class exemption from Board approval under 49 U.S.C. § 10902 because that section does not embrace leases between rail carriers. In support of this construction, the Union notes that the caption for § 10902 is "Short line *purchases* by Class II and Class III rail carriers" (emphasis added), and that the transaction at issue in this case is not a purchase but a lease. The pertinent section, says the Union, is § 11323, which deals expressly with leases. Captions are relevant and helpful aids in statutory interpretation, but they do not control. *United States v. Medley*, 913 F.2d 1248, 1258 (7th Cir.1990); *Brotherhood of R.R. Trainmen v. Baltimore & O. Ry.*, 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (The "fact that certain provisions of ... [a] section deal with something more than might be indicated by the heading" is "obvious.").

More important than the caption is the text of the statute itself. See *Continental Can Company, Inc. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F.2d 1154, 1157 (7th Cir.1990) ("The text of the statute ... is the law."). Here the operative language is that § 10902 applies when a Class II or III rail carrier "acquire[s] or operate[s] an extended or additional rail line ...." 49 U.S.C. § 10902(a). In the absence of statutory definition, we give terms their ordinary meaning. *United States v. Bank of Farmington*, 166 F.3d 853, 865 (7th Cir.1999). Leasing is in common parlance a form of "acquisition," cf. *Wisconsin Central Limited v. STB*, 112 F.3d 881, 885 (7th Cir.1997) (treating a lease as an acquisition); *Pro–Eco, Inc. v. Bd. of Commissioners, Jay County, Indiana*, 57 F.3d 505, 509 (7th Cir.1995) (same), and there is no doubt that Chicago Rail Link is "operating" what the Board has reasonably determined to be extended or additional rail line.

There is indeed some tension between the text and the caption. Were there some strong argument from policy, purpose, or

legislative history suggesting that the caption's apparent restriction of the scope of the provision reflected the intent of Congress, we would have to give the matter more careful attention. "Given that text is at times inconclusive, the courts must decide what sources they will consult in an effort to find meaning in the text and resolve individual cases. Legislative history is certainly one potential source of meaning." James J. Brudney, *Congressional Commentary on Judicial Interpretations of Statutes: Idle Chatter or Telling Response?*, 93 *Mich.L.Rev.* 1, 10 (1994); see also *Continental Can*, 916 F.2d at 1158 ("[L]egislative intent [offers] a clue to the meaning of the text."). But the Union alleges no such countervailing considerations and cites only the language of the caption. The plain language of the statute, however, would oppose the Union's interpretation even if reviewed de novo, and so it would be reasonable for the Board to reject that interpretation under *Chevron* deference.

The Union also argues that the Board errs in interpreting the "acquire or operate" language from its own regulations, mistakenly treating as applicable to the § 10902 carrier class exemption an interpretation of the § 10901 noncarrier class exemption under which "acquire" and "operate" extend to leases. See *Class Exemption–Aqu. & Oper. of R. Lines Under 49 U.S.C. 10901*, 1 I.C.C.2d 810 n. 1 (1985) ("The terms 'acquire' and 'operate' include interests in railroad lines of a lesser extent than fee simple ownership, such as a lease or a right to operate."). Normally, as we have said, "an administrative agency's interpretations of congressional acts, and even more so of its own regulations, are due great deference." *Baxter Healthcare Corp.*, 901 F.2d at 1407. Lesser deference may be in order depending on the "circumstances surrounding the agency's adoption of its statutory interpretation." *Bankers Life and Casualty*, 142 F.3d at 979 (" '[W]e do not apply *Chevron*'s "rubber stamp" to interpretive rules.' ") (internal citations omitted). The Union fails to explain here why the circumstances surrounding the adoption of the regulations at issue warrant a less deferential standard of review. But even if we were to review the Board's interpretation de novo we would have to con-clude, for reasons explained above, that "acquire or operate" in 49 U.S.C. § 10902 can be read to include leasing.

The last arrow in the Union's quiver is an argument from the canon of statutory interpretation which states that different statutory sections are to be interpreted so as to be consistent with one another. The Union claims that the Board's treatment of § 10902 as covering leases renders that section inconsistent with § 11323, which clearly covers leases. See 49 U.S.C § 11323(a)(2). This would be a powerful argument were it true, but it is not true. The Union claims that it would be so perverse and unjust to allow the Board to choose under which of these statutes to proceed that Congress could not have intended that result. The Union's first basis for this claim is that the standards which the Board is to apply under each section differ ("public convenience and necessity" under § 10902 and "competitive consequences and public interest in significant transportation needs" under § 11323). This is the purported inconsistency. But the Union does not explain what is at stake in a choice between these standards that would generate inconsistency, much less perverse injustice.

The Union's second and real basis is that the employee protective conditions differ under each provision, with the one chosen by the Board disfavoring the Union. It begs the question, however, to assert that this is a reason that Congress could not have meant to allow the Board to apply a provision to the transaction exempting the railroad from employee protective conditions. If that is indeed perverse and unjust, the remedy is not in the courts but before the Board and, ultimately, with Congress.

The Union's petition for review of the determination of the Board is therefore DE-NIED.